## IN THE CIRCUIT COURT FOR BALTIMORE CITY, Maryland

Jane Doe, individually
    c/o The Law Offices of Steven H. Heisler
    1011 N. Calvert Street
    Baltimore, MD 21202,

    Plaintiff

v.

Mercy High School, Inc.
1300 East Northern Parkway
Baltimore, MD 21239
Serve on: Linda H. Jones, Resident Agent
        218 North Charles St., Ste 400
        Baltimore, MD 21201

    and

Board of Trustees, Mercy High School, Inc.
1300 East Northern Parkway
Baltimore, MD 21239
Serve on: President Mary Beth Lennon
        1300 East Northern Parkway
        Baltimore, MD 21239

    and

Mercy High School Asset Management, LLC
1300 East Northern Parkway
Baltimore, MD 21239
Serve on: Linda H. Jones, Resident Agent
        218 North Charles St., Ste 400
        Baltimore, MD 21201

    and

Sisters of Mercy of the Americas, Inc.
8403 Colesville Road, Suite 400
Silver Spring, MD 20910
Serve on: CSC-Lawyers Incorporating Service Co.
        7 St. Paul Street, Suite 820
        Baltimore, MD 21202

    and

Sisters of Mercy of the Americas South Central
Community, Inc.
101 Mercy Drive, Belmont, NC 28012
Serve on: CSC-Lawyers Incorporating Service Co.
        7 St. Paul Street, Suite 820
        Baltimore, MD 21202

    and

Case No. 24-C-23-001453

Mercy Education System of the Americas, Inc.
8403 Colesville Road, Suite 400
Silver Spring, MD 20910
Serve on: CSC-Lawyers Incorporating Service Co.
7 St. Paul Street, Suite 820
Baltimore, MD 21202

Defendants

## COMPLAINT
### Demand for Jury Trial

Plaintiff Jane Doe,[1] by her counsel, sues Mercy High School, Inc., the Board of Trustees of Mercy High School ("Board of Trustees"), Mercy High School Asset Management, LLC ("Mercy High School Asset Management"), the Sisters of Mercy of the Americas Inc. and the Sisters of Mercy of the Americas South Central Community, Inc. (collectively the "Sisters of Mercy"), and Mercy Education System of the Americas, Inc. ("Mercy Education System"), and states:

### NATURE OF THE ACTION

1.    In 2015, Mercy High School hired Ernest Jackson, IV ("Jackson")[2] as an assistant indoor track coach. The next year, Jane Doe, a vulnerable youth, who had just immigrated from Honduras to the United States, started the 9th grade at Mercy High School. A few months later, she joined the indoor track team coached by Jackson who, sensing her vulnerability, targeted, groomed, and sexually abused Jane Doe during her freshman and junior years when she was 14 and 16 years old. Most of the abuse, including Jackson anally raping Jane Doe, occurred in the

---

[1] Plaintiff brings this action anonymously because the sexual abuse occurred when she was a minor, entitling her identity to be protected from disclosure. Jane Doe's identity should be evident but will be disclosed to Defendants after or contemporaneously being served in this action.

[2] At Mercy High School, Ernest Jackson, IV, requested to be and was identified by his nickname, "EJ." Jackson's nickname will not be used here to identify him because it conveys a sense of familiarity and endearment that is inappropriate for a sexual predator.

2

equipment room of Mercy High School that is both visible and feet from the Athletic Director's Office.

2.     This action concerns the Defendants' failure to protect the vulnerable Jane Doe from Jackson's repeated sexual abuse, their failure to stop Jackson to prevent further abuse, and the unlawful retaliation she suffered after the abuse was reported exacerbating Jane Doe's trauma, harm, and damages.

3.     Less than two years after Jackson pled guilty to sexually abusing Jane Doe, he was murdered in Baltimore City on July 26, 2022. Jackson is therefore unavailable to answer civilly for his repeated sexual abuse of Jane Doe.

4.     Jane Doe sues Mercy High School, its Board of Trustees, Mercy Asset Management, Sisters of Mercy, and Mercy Education System, jointly and severally, for their failure to protect Jane Doe from Jackson's sexual abuse under claims of negligence and gross negligence in the hiring, supervision, monitoring, training, and retention of Jackson, as well as breach of fiduciary duty, and for violations of Title IX, Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, including retaliation.

## JURISDICTION AND VENUE

5.     Jurisdiction is vested in this Court pursuant to Maryland Code, Courts & § 1-501.

6.     This Court has personal jurisdiction pursuant to Maryland Code, Courts & § 6-102.

7.     Venue is proper pursuant to Maryland Code, Courts & § 6-201.

## THE PARTIES

8.     *Plaintiff Jane Doe* was born on April 3, 2002, in Honduras. She is 20 years old and has resided in Baltimore City since her family moved to the United States in 2016. Jane Doe

3

attended Mercy High School from the fall of 2016 until May of 2020 when she graduated. Jackson sexually abused Jane Doe during her freshman and junior years when she was 14 and 16 years old, respectively.

9.    **Defendant Mercy High School** is a Maryland corporation that owns and operates a private Catholic, college preparatory school for girls located at 1300 East Northern Parkway, Baltimore, MD 21239. Mercy High School has received or receives federal funding, including Paycheck Protection Program loans pursuant to 15 U.S.C. § 166, *et. seq.* ("CARES Act"). On information and belief, Mercy High School has also received other federal funding under various programs and is therefore subject to Title IX.

10.    At all times during Jane Doe's enrollment at Mercy High School, Jeanne Blakeslee was the principal and held that position until her retirement in 2021. Principal Blakeslee holds a master's degree in clinical psychology and was responsible for the day-to-day management and student affairs of Mercy High School. On information and belief, Principal Blakeslee reported to the school's president, Mary Beth Lennon, the highest-ranking administrator of Mercy High School, who is a member of and reports directly to Mercy High School's Board of Trustees.

11.    **Defendant Board of Trustees** is located at 1300 East Northern Parkway, Baltimore, MD 21239. Although the Board of Trustees is not registered as a business with the Maryland State Department of Assessments and Taxation ("SDAT"), it is supervised by and under the control of the Sisters of Mercy and Mercy Education System and is responsible for fulfilling the Sisters of Mercy's mission of ensuring that Mercy High School provides an education according to the standards of Catholic identity and Mercy tradition and according to its contractual obligations under the *Covenant*. On information and belief, the Board of Trustees also controls and manages Mercy High School's assets held by Mercy High School Asset Management.

4

12.    **Defendant Mercy High School Asset Management** is a Maryland limited liability company located at 1300 East Northern Parkway, Baltimore, MD 21239. It is a wholly owned subsidiary of Mercy High School, its parent corporation. Mercy High School Asset Management was formed in 2007 to hold the assets of Mercy High School and, on information and belief, shield the assets from creditors. The Board of Trustees manages the assets of Mercy High School Asset Management subject to the control and authority of the Sisters of Mercy through Mercy Education System.

13.    **Defendant Sisters of Mercy of the Americas, Inc.** and **Defendant Sisters of Mercy of the Americas South Central Community, Inc.** (collectively referred to herein as the Defendant, **Sisters of Mercy**) are both registered as foreign corporations in the State of Maryland and organized under the laws of Missouri. Their principal offices are at the above-captioned addresses. The Sisters of Mercy, directly and through Mercy Education System, sponsors Mercy High School.

14.    **Defendant Mercy Education System** is registered as a foreign corporation in Maryland. It is organized under the laws of Missouri and shares a principal office with the Sisters of Mercy located at 8403 Colesville Road, Suite 400, Silver Spring, MD 20910. The Sisters of Mercy formed Mercy Education System in 2017 and delegated to it the authority and responsibility to oversee their sponsored schools that includes Mercy High School.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

### Sisters of Mercy's Contractual Sponsorship of Mercy High School

15.    The Sisters of Mercy is an international community of Roman Catholic women founded by Catherine McAuley in Dublin, Ireland in 1831. It credits its roots and commitment to education to Catherine McAuley and therefore is closely affiliated with the Irish Order and is aware of its history, including its failure to protect children entrusted to its institutions from abuse.

16.    Mercy High School is part of the South Central Community of the Sisters of Mercy of the Americas.[3]

17.    At all relevant times, Sisters of Mercy has sponsored Mercy High School.

18.    In 2017, the Sisters of Mercy created the Mercy Education System and delegated to it the authority and responsibility to ensure that their sponsored schools fulfill the Sisters of Mercy's mission of Mercy Charism and Catholic Identity (also referred to as "Catholic and Mercy Identity" and/or "Mercy Education").[4]

19.    The Sisters of Mercy's sponsorship of Mercy High School, however, is not simply one of ecclesiastical affiliation and guidance. Sponsorship is governed by a contract believed to be the *Covenant*.

20.    According to the *Covenant*, the Sisters of Mercy, through Mercy Education System, and each of their sponsored schools are "partners" in a "relational covenant."

21.    The *Covenant* sets forth the contractual obligations of the parties in this partnership (Exhibit No. 1, *Covenant*).[5]

22.    In consideration for Sisters of Mercy's agreement to sponsor a school, the member school agrees to participate in the Mercy Education System and to grant Mercy Education System

---

[3]  There are six geographical communities with 55 schools that comprise the Sisters of Mercy of the Americas. It is unclear why Mercy High School is part of the South Central Community rather than the Mid-Atlantic Community that includes Pennsylvania, a state that borders Maryland. The South Central Community includes 18 states, the U.S. Territory of Guam, and the nation of Jamaica.

[4]  A school's "Mercy Charism" is an identity and practice "firmly rooted in the Gospel of Jesus Christ." Its "Catholic Identity" is demonstrated through its "curricular offerings, prayer, and liturgical life, retreats and service opportunities." (See Exhibit No. 2 and *https://mercyedu.org/about/mission/*).

[5]  The *Covenant* is also available on the Mercy Education System website at *https://mercyedu.org/wp-content/uploads/2018/10/Sample-Covenant-of-Relationship.pdf*. According to the document properties of the *Covenant*, it was created by Lisa Marie Griffith on 10/31/2018, the Executive Director of Mercy Education System.

reserved governance powers and control over its board, the latter by requiring a sponsored school to obtain the consent of Mercy Education System before the board is authorized to take its most critical and basic functions.[6]

23.    By accepting these plenary oversight responsibilities of a school's board, Mercy Education System, on behalf of the Sisters of Mercy, is also responsible to ensure that the board fulfills its fiduciary duties to set the direction of the school and establish its policies and programs to provide students and the school's community with a Mercy Education (Exhibit No. 1, *Covenant*).

24.    Among other things, a Mercy Education requires a sponsored school to incorporate the Five Critical Concerns of the Sisters of Mercy in its curriculum and education and community involvement of parent groups, faculty/staff, board, constituents, etc. (See, Exhibit No. 2, *Catholic Identity in the Mercy Tradition*, and Mercy Education Mission Accountability Self-Study/Peer Review Guide for Mercy Education Secondary Schools, *at https://677961.p3cdn1.secureserver.net/wp-content/uploads/2022/02/EN-2021-Mission-Accountability-Guide-Secondary-compressed.pdf*).

---

[6] Specifically, the *Covenant* provides that a local school board must obtain the consent of Mercy Education System to a) adopt or change its mission, purpose, philosophy or objectives of the corporation or to change the general structure or change the general structure of its operation as a voluntary non-profit corporation for education; b) amend the corporation's charter, certificate or articles of incorporation, or bylaws; c) dissolve, divide, convert, liquidate, or wind up the corporation, or consolidate/merge the corporation with another corporation or entity; d) create any subsidiary corporation; e) sell all or substantially all the assets of the corporation; f) elect members of the board of the corporation upon recommendation of the Board of Directors [of Mercy Education System]; g) remove, with or without cause, members of the Board of Trustees; h) ratify a candidate nominated by the Board of Directors [of Mercy Education System] as the chief executive officer of the corporation; and i) approve any encumbrance of assets of the corporation in excess of the limits determined and promulgated from time to time by MESA [Mercy Education Systems] (Exhibit No. 1)

25.     One Critical Concern is Nonviolence and preventing violence and abuse of women and children, a policy that by definition is also for the benefit of Mercy High School students all of whom are women and children.

26.     Consequently, under the *Covenant* the Sisters of Mercy and Mercy Education System are contractually responsible for the policies and programs of Mercy High School and ensuring its policy to prevent violence and abuse against its students is comprehensive, implemented, and effective to recognize, prevent and report sexual abuse.

### The Failed Child Abuse Prevention Policies of Mercy Institutions

27.     As the Sisters of Mercy and Mercy Education System are aware and therefore sanction given their contractual responsibility for a sponsored school's policies, Mercy High School adopts and follows the Archdiocese of Baltimore's *Statement of Policy for the Protection of Children and Youth* ("Archdiocese's Policy" or "Policy") to prevent the sexual abuse of its students.

28.     Mercy High School's adoption of the Archdiocese's Policy is unsound and irresponsible for two reasons: 1) the Archdiocese has a history of failing to protect children from sexual abuse, and 2) the Archdiocese's Policy is written for its Covered Entities and therefore its applicability to the faculty and staff of Mercy High School is unclear and confusing.

29.     In its recent report entitled "Clergy Abuse in Maryland," the Office of the Attorney General of Maryland confirmed that more than 600 children entrusted to the Archdiocese of Baltimore were sexually abused by at least 158 Roman Catholic priests of the Archdiocese.

30.     The Archdiocese therefore has never had an effective child protection policy and is particularly unqualified to devise one.

31.     The Sisters of Mercy is not only aware of the Archdiocese's failed child protection policy but keenly aware of its own failures to protect children from abuse in the care of its institutions, including Jane Doe.

32.     The largest scandal of abuse concerned the Sisters of Mercy's founding Irish Order and the physical and sexual abuse of children in its institutions in the late 1980s and early 1990s. Likewise, the Sisters of Mercy of the Americas has been beset by allegations, litigation, and convictions of the sexual abuse of boys and girls by nuns, teachers, and coaches. The most recent allegations against the Sisters of Mercy is docketed as *Jane Doe, et al v. Mount Saint Mary High School, et al,* Case No. 5:22-cv-00992-R (United States District Court of Oklahoma Western Division)[7].

33.     Permitting Mercy High School to adopt and follow the Archdiocese's Policy is also unsound and irresponsible because of the Policy itself. The Archdiocese's Policy is written for its Covered Entities and therefore fails to provide the faculty and staff of Mercy High School, a non-covered entity, with a clear and unambiguous policy to prevent, recognize, and report sexual abuse.

34.     The Archdiocese's Policy also does not mandate students to report the sexual abuse of their classmates. Had such a policy been in effect when Jane Doe attended Mercy High School, her friends would have been required to report Jackson's abuse of Jane Doe as early as 2016 and have prevented him from further abusing her.

35.     Given the history of abuse of children in the care of the Archdiocese and Sisters of Mercy and because the Archdiocese's Policy is written for its Covered Entities, the Sisters of Mercy, Mercy Education System, Mercy High School, and its Board of Trustees jointly owe a duty to the students of Mercy High School to write and implement a child abuse protection policy that is expressly for the benefit of Mercy High School and that clearly informs staff and faculty of

---

[7] Fourteen Jane Does allege that since 2006, Mount Saint Mary High School ("MSM"), a school sponsored by the Sisters of Mercy of the Americas South Central Community, Inc., has perpetuated a rape culture that shamed women and girls and tolerated sexual harassment and assault of girls by men and boys, including students, teachers, and coaches (See Complaint filed in *Jane Doe, et al v. Mount Saint Mary High School, et al,* Case No. 5:22-cv-00992-R (United States District Court of Oklahoma Western Division).

screening, training, and reporting procedures as well as conduct that is prohibited when working with minors.

36.    As demonstrated below, the Defendants' professed commitment to protect children and youth from sexual abuse is belied by Mercy High School's adoption of the Archdiocese's Policy, and like the many victims before her, failed to prevent Jackson from sexually abusing Jane Doe under the proverbial noses of Mercy High School's administration.

### Mercy High School Hires Ernest Jackson, IV

37.    In 2015, Mercy High School had an opening for an assistant track coach. Athletic Director Nicholas (Nick) Gill recruited Jackson for the position. Director Gill had known Jackson for years. His younger brother and Jackson were childhood friends, and they were all graduates of Calvert Hall College High School.

38.    On information and belief, Mercy High School hired Jackson on Director Gill's recommendation alone, and therefore permitted Jackson to be hired without the screening and processing required by the Archdiocese's Policy and mandated by applicable law.

39.    The Archdiocese's Policy, Section 3.5 Coaches, states that a coach who receives remuneration for working with minors is considered an employee and all requirements of the Archdiocese's Policies and Procedures must be completed with required documentation "before a Coach may begin employment in the Archdiocese of Baltimore" (See Archdiocese's Policy Section 3.5.3).

40.    Among other things, Jackson was therefore required to submit to a CJIS Fingerprint-based Criminal History Record Information Check (See Archdiocese's Policy Section 3.3.7) and internet Criminal History Screening (See Archdiocese's Policy Section 3.3.7.1) and provide a minimum of three professional references (See Archdiocese's Policy Section 3.3.5).

41.    The Archdiocese's Policy also follows Maryland law that prohibits a public or nonpublic school from hiring or retaining an employee who has been convicted of certain crimes (See Archdiocese's Policy Section 3.3.6.1), including assault in the first degree *See* Md. Code Ann. Educ. § 6-113 (a) (3) and § 2-206.1 (a)(3), both statutes referencing and Md. Code Ann. § 14-101 (a) (21).

42.    Jackson's criminal and civil history was available to Mercy High School on Maryland Judiciary Case Search before he was hired in 2015 and proves two things: 1) Jackson's 2008 first degree assault conviction unequivocally disqualified him from employment; and 2) his history of alcohol abuse, including endangering a minor while driving intoxicated, among other things, demonstrate that he was unsuitable to work with minors.

43.    The following are the results for Jackson that were available in the fall of 2015 from Maryland Judiciary Case Search as follows:

**2008 DWI While Transporting a Minor**: on May 16, 2008, Jackson was found guilty and incarcerated for driving while impaired by alcohol while transporting a minor on August 11, 2007 (*State of Maryland v. Jackson, Ernest*, Case No. 03-K-08-000785).

**2008 Conviction First Degree Assault**: on 10/13/2007, Jackson was arrested for first and second degree assault. He was subsequently indicted and found guilty of first degree assault in 2008. He received a 10 year sentence with 9 years, 6 months suspended and 5 years of probation. Thereafter, he violated his probation on eight separate occasions, the last in April of 2014 (*State of Maryland v. Ernest Jackson IV*, Case No. 03-K-07-005077 and 2C00286337).

**2013 Civil Contempt Child Custody & Support Matter**: in July of 2013, Jackson was sued for custody and child support. During the seven year pendency of this matter, Jackson was found in continuing contempt and child support arrears. Sole custody was granted to the child's mother (*Zacharski v. Jackson*, Case No. 03-C-13-007821).

**2013 Domestic Violence**: in August of 2013, a protective order was filed against Jackson for domestic violence and granted. He was finally ordered not to abuse, not

contact, not to enter residence, stay away from employment, and surrender firearms (*In Re: Ernest Jackson*, Case No. 0804-SP-05039-2013)[8].

**2014 DWI:** on January 18, 2014, Jackson was charged with driving while impaired with alcohol, unsafe lane changing, and excessive speed. He was subsequently found guilty of driving while impaired with alcohol, incarcerated, and ordered to undergo treatment for alcohol abuse (*State of Maryland v. Ernest Jackson IV*, Case No. 20H0B0N).

**2015 Driving w/ Suspended License:** on April 10, 2015, Jackson was charged with driving with a suspended license. He was found guilty on 08/19/2015 and received probation before judgment (*State of Maryland v. Ernest Jackson IV*, Case No. 03M0JGQ).

44.    In addition to Jackson's ineligibility for employment because of his first degree assault conviction, Jackson's other offenses and conduct made him unsuitable for employment as a coach working with minors at Mercy High School,

45.    Moreover, a proper check of Jackson's references may have revealed his inappropriate contact with a minor just months before Mercy High School hired him. On August 17, 2015, Jackson raped a 15-year-old girl in her Harford County home. In 2019, he was indicted and subsequently convicted for that rape.

46.    It is therefore undisputed that Mercy High School did not follow its own policy or Maryland law when it hired Jackson despite his ineligibility for employment, and therefore unlawfully provided him with the authority and access to groom, target, and abuse Jane Doe.

**Jane Doe Enrolls in Mercy High School**

47.    Jane Doe was born in Honduras and lived there with her parents until she was 14 years old. Her mother is Honduran and a practicing Catholic. Her father is Jewish and lived in

---

[8] The Maryland Judiciary Case Search for this matter incorrectly reflects Jackson's year of birth as 1989 rather than 1988. Because the other identifying information is correct, this domestic violence case is attributed as being filed against Jackson.

12

Baltimore and Florida before moving to Honduras where he met, married, and started a family with Jane Doe's mother.

48.    In 2016, Jane Doe's parents decided to move to the United States.

49.    Before moving, they submitted Jane Doe's application to Mercy High School because of its representations that it provided a "rigorous education marked by academic excellence and personal attention" while "maintaining and promoting a healthy and safe environment for all students." Jane Doe's parents also believed that an all-girls Catholic school could benefit their highly intelligent daughter because it did not have the added distraction of boys.

50.    Mercy High School accepted Jane Doe as an incoming freshman, Class of 2020. It was enthusiastic that Jane Doe was bilingual in Spanish and English and her Honduran origin added to the school's goal of diversity.

51.    Jane Doe's exposure to the United States before moving here, however, was limited to visiting her grandmother in Baltimore during her summer vacations. Consequently, she was anxious and nervous about moving and starting at a new school. She was particularly concerned about fitting in with her peers and generally assimilating.

52.    Adding to her apprehension, Jane Doe knew she had to familiarize herself with a new campus, new rules, new expectations, and would now be learning exclusively in English. She was also concerned that, as part of a small minority among a predominantly white student body, she would be subjected to discrimination.

53.    Soon after moving from Honduras to Baltimore, Jane Doe began the 9th grade at Mercy High School.

54.    Mercy High School knew or should have known that Jane Doe, a 14-year-old Honduran immigrant attending a new and foreign school, was a vulnerable youth. It took no steps,

13

however, to ensure that she was adjusting to her new environment.

## Jackson Sexually Abuses Jane Doe

55.    Homesick for Honduras and eager to make new friends, Jane Doe decided to try out for the indoor track team. She believed that her success in running track in the 8th grade in Honduras could be repeated at Mercy High School, a perfect vehicle to be accepted by her peers and make friends.

56.    Jane Doe first met Jackson when she tried out for the indoor track team in the fall of 2016. Jackson was in his late 20's and students thought he was good-looking and "really cool."

57.    Jackson reported directly to Eric Coles, the track team coach, and Jackson and Coles reported to Director Gill, the Athletic Director. When Jackson was not coaching, he could be found at or around the school gym or athletic department, often flanked by students socializing with him.

58.    Jackson was generally flirtatious with Jane Doe after she joined the track team. His first blatant sexual misconduct toward Jane Doe occurred at a track meet in the winter of 2016-2017. Towards the end of the track meet, Jane Doe was talking and socializing with students from other schools, some of whom were boys.

59.    Afterwards, Jane Doe started walking back to her team and toward the bus. As she passed Jackson, he called her a "horny ball," seemingly for socializing with boys.

60.    Jane Doe was surprised and confused. She knew that Jackson calling her a "horny ball" was inappropriate but, at the same time, she felt flattered. The young, cool, good-looking coach was paying special attention to her.

61.    As a skilled sexual predator, Jackson recognized Jane Doe's vulnerability. By calling her a "horny ball," Jackson knew he was giving Jane Doe the attention she craved while

testing her tolerance for his inappropriate conduct. If she did not challenge his "horny ball" comment, he knew that he could victimize her.

62.    At the moment that Jackson called Jane Doe a "horny ball," his grooming of Jane Doe had begun. That same day, he molested and sexually assaulted Jane Doe for the first time.

63.    During her freshman year, Jackson repeatedly abused Jane Doe in the equipment room, which is both visible and feet from Director Gill's Office. When Jackson wanted to abuse Jane Doe, he would signal her, text her, or message her on social media and tell her to meet him in the equipment room.

64.    The abuse happened during school hours and at night, between the time they returned to Mercy High School after track meets and before her father picked her up.

65.    Jackson's preferred method of abuse was physically forcing Jane Doe's head to his penis and holding it there for oral sodomy. He also attempted to rape her vaginally and did rape her anally causing Jane Doe actual and painful physical injuries.

66.    After each instance of abuse, Jackson warned Jane Doe not to tell anyone about their encounter.

67.    Jane Doe did confide in a few of her closest friends about Jackson because she thought he cared about her and "one day we could be together. He told me that whenever I was 18, we could be together." "I wanted to be with him. I liked him... he told me not to tell, and I thought it was our secret. I liked the attention. I liked that he would ask me about my issues with my mother. He cared about me, I liked that."

68.    Mercy High School staff and other students also noticed Jackson's inappropriate attention to and contact with Jane Doe.

69.    Students observed that Jackson and Jane Doe looked like a couple rather than a coach and a student.

70.    Security Guard Roland Wallace, now deceased, witnessed Jackson and Jane Doe leaving Mercy High School together late in the evening and warned Jackson against the same. On information and belief, Mr. Wallace did not report his observations to the administration.

71.    During her sophomore year, Jackson did not ask Jane Doe for sex, although he would occasionally message her on social media. Jane Doe stated that she continued to see Jackson at school and track, but "he acted like nothing happened." "I felt like he was with another girl," specifically A.C., as discussed below.

72.    Jackson's inattention made Jane Doe confused, sad, and increasingly insecure. She became depressed and attempted suicide in January of 2018. She also began to abuse drugs and alcohol to cope with her conflicted and uneasy feelings about Jackson and his abuse. Jane Doe was unaware then of what she knows now; her depression and suicide attempt were directly attributed to Jackson's sexual abuse of her and subsequent rejection.

73.    During the fall semester of her junior year, Jackson's abuse of Jane Doe resumed. It occurred in the equipment room, and on one occasion, Jackson met Jane Doe near her home and asked her if she wanted to "fuck" in exchange for marijuana.

74.    Jackson's criminal indictment, including the investigation of his repeated abuse of Jane Doe, specifically documents the instances of sexual abuse. Consequently, the particular details will not be reiterated here.

## Mercy High School's Deliberate Indifference to Jackson's Abuse

75.    Further confirmation that Mercy High School had no effective or operative child protection policy is the opportunity it ignored to evaluate Jackson's suitability for employment which, if properly considered, would likely have prevented Jackson from further abusing Jane Doe after January of 2017.

16

76.     At the same time that Jackson was abusing Jane Doe, she noticed that he was paying excessive attention to A.C., a junior on Mercy High School's track team.[9] There were rumors that Jackson was abusing or grooming A.C.

77.     The rumors appeared to be substantiated when the track team observed Jackson arguing with A.C. after a track meet because she was driving back with her boyfriend instead of taking the bus back to school with Jackson.

78.     In addition to these rumors and Jackson's displays of jealousy, it is undisputed that A.C. and her parents reported to the administration that Jackson had inappropriate contact with A.C. and harassed her.

79.     Specifically, in January of 2017, A.C., a junior at Mercy High School and member of the indoor track team, fell asleep on the bus ride to the track championship. When the bus arrived at the venue, A.C. was still sleeping. To wake her up, Jackson used his hand and struck A.C. with a thud on her upper thigh. Jackson then continued to harass and pick on A.C. at the track meet. In tears and outraged, A.C. called her stepfather to complain that Jackson inappropriately touched her upper thigh, was harassing her, and that she was "tired of dealing with" him.

80.     On information and belief, when the bus returned from the track meet, A.C.'s stepfather confronted Jackson, telling him to leave A.C. alone.

81.     It is believed that Director Gill learned about the incident and reported it to the administration. According to A.C., Principal Blakeslee and President Lennon told her that if A.C.'s stepfather did not want her to have contact with Jackson, she would have to stop running

---

[9] To protect A.C.'s privacy, she will not be named in this Complaint. The Defendants, however, will know her identity based on the facts set forth in the Complaint.

track,[10] a classic and offensive instance of victim blaming. It is also contrary to the Archdiocese's Policy that requires the accused to have no contact with the victim (See Archdiocese's Policy Section 7.4.6). Not the other way around.

82.    Principal Blakeslee and President Lennon also held a meeting with Jackson, Director Gill, and A.C.'s parents. At the meeting, Jackson admitted that he touched A.C., and according to Director Gill because "the allegations didn't seem weren't (sic) of a sexual nature…it just ended right there."

83.    Mercy High School's response to A.C.'s complaint violated the Archdiocese's Policy that considers infringing on a minor's appropriate boundaries, in this case, Jackson touching/striking/groping A.C.'s upper thigh, "Misconduct with a Minor."

84.    Pursuant to the Archdiocese's Policy, a report of Misconduct of a Minor triggers an investigation, a written report of the investigation's finding, appropriate personnel action which can include termination, notification to civil authorities if appropriate, and assessment of the accused's fitness for working with minors, among other required actions.

85.    Jackson violated A.C.'s personal boundaries and therefore committed Misconduct with a Minor or Sexual Abuse, because there are no circumstances in which Jackson touching/striking/groping of A.C.'s upper thigh would have been appropriate.

86.    The very conduct that is prohibited by the Archdiocese's Policy and that A.C. and her parents found unacceptable and offensive, Mercy High School chose to ignore and minimize, failing to investigate and process according to its own policy. Mercy High School's inadequate response to Jackson's misconduct in contravention of the Archdiocese's Policy constitutes

---

[10]    It is unclear at the time of this filing if A.C. also attended the administration's meeting with Jackson, Director Gill, and her parents.

deliberate indifference that would have prevented Jackson's further abuse, molestation, and exploitation of Jane Doe.

### Jackson's Sexual Abuse of Jane Doe is Revealed

87.     Jackson sexually abused Jane Doe for the last time on Tuesday, November 13, 2018, her junior year. Jackson knew that Jane Doe was free last period and texted her to meet him in the equipment room and forced her to perform oral sodomy on him.

88.     When Jane Doe left the equipment room, she told her friends, C.C and O.G., about the abuse and that she felt disgusted with herself. When Senior K.M. learned about the abuse later that week, she told Jane Doe's friends that it must be reported.

89.     On Monday, November 19, 2018, K.M., C.C., and O.G. went to Jackson's direct supervisor, Eric Coles, and reported the history of abuse. Coach Coles then contacted Director Gill and they both went to the administration and reported the abuse to Principal Blakeslee and/or President Lennon.

### Mercy High School's Improper Response & Inappropriate Investigation

90.     Contrary to its representation in the Student/Parent Handbook, Mercy High School did not follow "the policies and procedures of the Archdiocese...as well as requirements of civil and criminal law" in response to reports of Jackson's sexual abuse of Jane Doe.

91.     After reporting Jackson's sexual abuse to Child Protective Services ("CPS"), on information and belief Mercy High School was required to refrain from investigating the abuse to avoid a conflict of interest, given Mercy High School's potential liability for not preventing the abuse and to avoid interference with the CPS and/or law enforcement investigation (See, December 17, 1991 Opinion of the Office of the Attorney General of Maryland *Investigations By School Systems of Allegations That Employees Committed Child Abuse* and Maryland State

Teachers Association *Child Abuse and Neglect Allegations Against School System Personnel*).

92.    This also appears to be consistent with the Archdiocese's Policy that comports with Maryland's legal reporting requirements and states the "Archdiocesan investigation of reports of suspected Abuse or Neglect by Church Personnel might be delayed pending investigation by the Department of Social Services and/or Law Enforcement" (See Archdiocese's Policy Section 7.0).

93.    On information and belief, Mercy High School was also required to refrain from interviewing Jane Doe beyond asking her for a brief description of what occurred and the identification of the alleged offender.  In addition to a conflict of interest and interfering with the investigation, improper interview techniques and requesting the victim to repeat the abuse may further traumatize the victim (See, December 17, 1991 Opinion of the Office of the Attorney General of Maryland *Investigations By School Systems of Allegations That Employees Committed Child Abuse.*).

94.    Ignoring these best and recommended practices and/or requirements, Principal Blakeslee instructed the school's counselor, Kathleen ("Kate") Gerwin, to question Jane Doe about Jackson's sexual abuse.[11]

95.    Jane Doe initially denied that Jackson abused her, a common response from a victim who not only wants to protect the abuser, but also protect their own reputation and avoid victim blaming, among other reasons.  Notwithstanding her counseling credentials and the proscription for interviewing the victim, Counselor Gerwin extensively questioned Jane Doe's denial of the abuse and warned her of the consequences if "she had made it up" further traumatizing her.

---

[11]  The Baltimore Police Department interviewed Counselor Gerwin, and other faculty as part of its investigation.  In her interview, Gerwin stated that throughout the day Principal Blakeslee updated her regarding the calls to CPS.  Whether CPS authorized Principal Blakeslee's improper actions in response to the reported abuse will be learned in discovery.

96.    Likewise, Principal Blakeslee, with a master's degree in clinical psychology and responsible for complying with child abuse laws and policy, was also unaware that a victim may initially deny that she was sexually abused. Rather than seek expert advice, Principal Blakeslee decided to meet with the students who reported the abuse and confront Jane Doe about her denials.

97.    As if that were not enough, Principal Blakeslee did not proceed quietly. Principal Blakeslee decided that the best time to call this meeting to confront Jane Doe about her denials of Jackson's abuse was the same day the abuse was reported. Not only would this meeting be with Jane Doe and the reporting students, but also L.P., a student who did not initially report the abuse but inserted herself in the investigation.

98.    At the meeting, both Principal Blakeslee and the students confronted Jane Doe who continued to deny the abuse. Principal Blakeslee's decision to confront Jane Doe in front of and with her peers was not only traumatic, scary, embarrassing, and humiliating for Jane Doe, but also a violation of policy and procedure.

99.    When Jane Doe's father picked her up from Mercy High School that day, he was told to report to the main office where he met with Principal Blakeslee and his daughter.

100.    Principal Blakeslee informed him that his daughter and Jackson were in a "sexual relationship," improperly suggesting that Jackson's criminal sexual acts on a minor were consensual.

101.    It was during this meeting with her father present that Jane Doe admitted that the abuse was true.

102.    By that time, however, she felt betrayed by her friends, humiliated by the administration, anxious about other students reactions to the abuse, and concerned about Jackson and the legal consequences of the abuse.

103.    On November 26, 2018, and after the criminal investigation began and without Jane Doe present, Principal Blakeslee continued to interfere and, in further violation of applicable laws and policy and/or best practices, held another meeting with the same students who initially reported the abuse concerning Jackson asking Jane Doe to "fuck" in exchange for marijuana.

## Police Interviews Reveal Ignorance of Child Abuse & Sexual Predators

104.    The day after Mercy High School reported Jackson's abuse, CPS contacted the Baltimore Police Department ("BPD") triggering the formal criminal investigation.  This included interviews with some of the Mercy High School faculty and staff, and Principal Blakeslee.

105.    From those interviewed, it is clear that Mercy High School staff and faculty were untrained and therefore uneducated in preventing, recognizing, and reporting child sexual abuse although such training is a mandatory requirement that must be renewed annually under the Archdiocese's Policy.

106.    **Counselor Kate Gerwin's 11/27/2028 Interview:** In addition to improperly questioning Jane Doe, Counselor Gerwin described Jackson's molestation to the BPD as a "sexual relationship," suggesting that Jane Doe consented to the abuse although, as a minor, she could not.  When asked by the BPD how Jane Doe was doing, Counselor Gerwin responded that she hasn't "seen her much…the couple of times they have spoken…she has been fine for part of it tearful for some." At no time did Counselor Gerwin indicate that there was a plan of action to help Jane Doe cope when she returned to school after the traumatic disclosure of the abuse.

107.    **Coach Eric Coles' 11/27/2018 Interview:** According to Coach Coles, Jackson was his assistant coach for about four years.  In his interview, Coach Coles confirmed that students came to him first to report Jackson's abuse of Jane Doe.  After Coach Coles informed Director Gill of the report of abuse, both Coach Coles and Director Gill reported the abuse to the

administration. Coach Coles further stated that after the initial report of abuse, the same students returned and further reported to him that Jackson offered Jane Doe marijuana in exchange for sex. Coach Coles told the BPD that it was not until after he learned about the sex for drugs that his support for Jackson wavered. He expressed to the BPD how badly he felt for Jackson who he said, "literally destroyed [his] life." Coach Coles also expressed concern for Jackson should he try to reach out to Jane Doe because he could "continue to incriminate himself." Unlike his compassion for Jackson, at no time did Coach Coles convey any concern or sympathy for Jane Doe, the actual victim of the abuse.

108.    **Athletic Director Nick Gill's 11/27/2018 Interview:**  Director Gill's interview with police revealed that he had very little understanding of child sexual abuse and adults who perpetrate the abuse. He also improperly described Jackson's abuse of Jane Doe as a "sexual relationship," suggesting that the abuse of Jane Doe was consensual. Director Gill told the BPD that he saw Jackson coming into practice the same day that Jane Doe was last abused in the equipment room that he confirmed was visible from his Office. Since the time that the abuse was reported, Director Gill stated that he had been "racking [his] brain" wondering if he saw Jackson "do anything strange that day."

109.    Director Gill also told the BPD that Jackson "wasn't a creepy guy," and questioned whether the abuse allegations were true. He stated, "I don't know if it's true or not but [Jackson] was a great coach, pushed the girls hard, showed up, was great at communication, so I didn't see anything suspicious about his behavior." In addition to erroneously believing that sexual predators are identified because they act strangely or look creepy, at no time did Director Gill convey any concern or sympathy for Jane Doe, the actual victim of the abuse.

110.    **Principal Jeanne Blakeslee's 11/27/2018 Interview:**  In addition to her improper

investigations and meetings with witnesses that interfered with the investigation and further traumatized Jane Doe, Principal Blakeslee stated to the BPD that when Jane Doe admitted that the abuse allegations were true, Jane Doe also allegedly stated that "she willingly participated in the sexual acts with Mr. Jackson." At no time did Principal Blakeslee inform the BPD that she corrected Jane Doe to inform her that, as a student and minor, she could never "willingly participate" in sexual acts with Jackson and that he had illegally abused her. Principal Blakeslee also did not convey any concern or sympathy for Jane Doe, the actual victim of the abuse.

111.    The above demonstrates that those interviewed were not trained or educated to prevent, recognize, and report child sexual abuse. This lack of training and education directly lead to some disbelieving Jane Doe's claims of abuse outright, and to others holding Jane Doe, a child and the victim, responsible for the abuse. This is evidenced by them describing the abuse Jane Doe suffered as a "sexual relationship" and their stunning inability to garner any compassion, sympathy, or concern for Jane Doe.

### President Lennon's Cover Up

112.    President Lennon first notified parents that Mercy High School received a report of Jackson's sexual abuse of a student by email dated 11/30/2018, 11 days after it was reported. She sent an update to parents on 12/07/2018 (Exhibit No. 3).

113.    Both emails informed parents that the safety and well-being of their children are paramount and a top priority for Mercy High School, only to be directly contradicted by the very reason she was writing in the first place, the sexual abuse of a student by a Mercy High School employee (Exhibit No. 3).

114.    Even more troubling, however, is that President Lennon knew or should have known that Mercy High School had violated Maryland law and the Archdiocese's Policy in hiring

Jackson because his first degree assault conviction made him ineligible for employment and his history of other conduct unsuitable for employment with minors.

115.    Despite these violations of law and policy, President Lennon intentionally misrepresented to parents that Mercy High School's hiring process complies with all applicable laws and that all candidates for employment "undergo a fingerprint criminal background check through the FBI's Criminal Justice Identification Services (CJIS) Division" that is updated automatically to apprise the school if employees are subsequently charged with crimes (Exhibit No. 3).

116.    President Lennon's misrepresentations to parents are both material and antithetical to Mercy High School's special and fiduciary duty to protect students.  They are also dishonest.

### The Administration's Further Retaliation Against Jane Doe

117.    Immediately after Jackson's abuse was reported to the administration and Jane Doe confirmed the same, Mercy High School began to retaliate against her by conducting unauthorized investigations and improper interrogations of Jane Doe, including requesting her peers to confront her about denying the abuse.

118.    Principal Blakeslee also violated Jane Doe's right to privacy and confidentiality when she involved her peers beyond their initial reporting resulting in the subsequent disclosure to their classmates about the abuse and Jane Doe's identity.

119.    Jane Doe did not attend school for the next two weeks.  She was depressed, humiliated, concerned about returning to school and reprisals, and worried about Jackson's fate.

120.    During Jane Doe's absence, President Lennon contacted her father a few times. While the conversations were pleasant, Jane Doe's father believes that President Lennon's calls were out of obligation rather than concern for his daughter.

121.   At no time prior to Jane Doe returning to school did Mercy High School devise a plan of action to ensure that she felt safe and secure to return to classes.

122.   At no time after the abuse was reported did the administration address with its students Jackson's termination, reports of his sexual abuse, or its policy and procedures to protect students.

123.   Therefore, and to Jane Doe's detriment, the administration failed to make clear to its student body that the administration takes reports of abuse seriously, that students are required to report any suspected abuse and may do so confidentially, and that Mercy High School has a zero-tolerance policy for harassing or bullying any victim of the alleged abuse.

124.   Consequently, when Jane Doe reluctantly returned to school, other students blamed her for having a popular and well-liked coach terminated, and bullied and harassed her.  Other students frequently and routinely called Jane Doe a "crack whore" and "slut," among many other derogatory terms.

125.   While the students who reported the abuse remained friendly with Jane Doe for some time after she returned to school, she did not trust them, feeling betrayed that they reported the abuse although they had known about it for more than two years.

126.   Jane Doe also no longer ran track, unable to face anyone on her team or the other coaches because of Jackson's abuse.

127.   She was so overwhelmed and distraught by the name-calling, bullying, and being blamed for Jackson's abuse and termination, by mid-December of 2018, Jane Doe was cutting herself, excessively drinking, and smoking marijuana.  She was also being sexually irresponsible. Her life was spiraling out of control, driving a wedge between Jane Doe and her few remaining friends at school.

26

128.    Jane Doe also believed that Principal Blakeslee did not think she was a victim and that she had "willingly participated" in a "sexual relationship" with Jackson. Therefore, Jane Doe believed that Principal Blakeslee blamed her for tarnishing the school's reputation and wanted Jane Doe to leave Mercy High School.

129.    Jane Doe's beliefs were corroborated when Principal Blakeslee suspended her on two separate occasions due to unfounded reports made by other students who disliked Jane Doe because of her abuse claims. These students reported to Principal Blakeslee that Jane Doe bought Adderall and drank alcohol at a school event.

130.    Jane Doe denied both incidents. Principal Blakeslee, however, did not believe her.

131.    Although no Adderall was found on Jane Doe's person or in her backpack, Principal Blakeslee threatened to call the police if Jane Doe did not admit to buying the drug.

132.    Nonetheless, with no proof of buying Adderall or drinking alcohol other than the gossip of the students who disliked her, Principal Blakeslee suspended Jane Doe for both unverified incidents.

133.    Not only can suspensions lead to expulsion, but Mercy High School affirmatively reports suspensions to colleges (See Handbook's Code of Conduct, Suspensions).

134.    Even if Principal Blakeslee had evidence that Jane Doe had purchased Adderall or used alcohol, suspension was an inappropriate response given there is a clear and distinct correlation between victims of child sexual abuse and drug and alcohol addiction. Therefore, if Jane Doe had violated school policy by buying drugs or using alcohol, it was to attempt to cope with the sexual abuse that she had suffered at hands of a Mercy High School employee on its campus.

135.    Other instances of Mercy High School's retaliation against Jane Doe concerned

27

false claims that her skirt was too short in violation of uniform regulations; denying Jane Doe's request to attend school remotely because she felt harassed and bullied by other students while allowing another student to attend remotely for a physical injury; and disregarding Jane Doe's complaint that her photography teacher had placed her in danger by demanding that she take a photograph too close to oncoming traffic.

136.    Mercy High School, therefore, retaliated against Jane Doe by taking contrived and adverse actions against her based on unfounded gossip to increase her chances of expulsion or being rejected from the colleges of her choice.

## The Arrest and Criminal Prosecution of Jackson

137.    On 11/22/2018, Jackson was arrested and charged with Sex Abuse of a Minor, Sexual Solicitation of a Minor, Sex Offense 4th Degree by a Person in Position of Authority, and Sex Offense Third Degree Sex Offense, involving Victim Jane Doe from August 2015 to November 2018.

138.    Based on the seriousness of the reported abuse and Jackson's criminal history, which includes first and second degree assault and possession of marijuana, the State considered Jackson "an extreme danger to the community and public safety, especially towards this Victim, based on the Defendant's position of authority and supervision of others." He was not entitled to bail and committed pending hearing (See State's Recommendation to the Commissioner for Conditions of Release, 11/30/2018).

139.    At the Initial Appearance on 12/01/2018, the Commissioner ordered Jackson held without bond because there is a reasonable likelihood that Jackson "poses a danger to the safety of the alleged victim, another person, or community."

140.    Jackson was released from commitment after his bail hearing with strict conditions for his release, the violation of which would cause his arrest.

141.    Throughout the next year, Jane Doe was required to meet with prosecutors from the Office of the State's Attorney for Baltimore City assigned to Jackson's criminal prosecution. Each meeting resulted in further trauma to Jane Doe because she was made to repeat the numerous instances of Jackson's abuse to prosecutors who appeared uninterested.

142.    Jane Doe experienced further trauma when she routinely received subpoenas in the mail for every scheduled trial date and thereafter for every continuance of the trial date.

143.    Two months before Jackson's criminal trial for sexually abusing Jane Doe, he was arrested for sex offense in the third degree, specifically having vaginal intercourse with a minor in her Harford County home in August of 2015, before Mercy High School hired Jackson. Jackson subsequently pled guilty to the sex offense and received prison time (*State of Maryland v. Ernest Jackson, IV,* Case No. C12-CR-19-1080).

144.    On 12/16/2019, with Jane Doe and her parents in attendance, Jackson pled guilty to sex offense in the fourth degree by a person in a position of authority and second degree assault.

145.    He received no prison time.

146.    Jane Doe was devastated.

147.    From a review of the State's Attorney's file, there is no evidence that Mercy High School contacted the prosecutors and/or insisted that Jackson receive prison time.

### Jane Doe's Injuries, Harm, and Damages

148.    The Archdiocese's Policy recognizes that those in a position of authority have the power "to do great good" or "to cause harm," and that when they commit child abuse, the victim is damaged emotionally, spiritually, physically, and psychologically (See, Introduction of Archdiocese's Policy).

149.    The Defendants' acts, omissions, and deliberate indifference that failed to protect Jane Doe from Jackson's sexual abuse caused the precise harm and damages recognized by the Archdiocese's Policy.

150.    Rather than provide Jane Doe and her parents with an education of "academic excellence and personal attention...where young women form habits of lifelong inquiry, critical thinking and courageous action in a global society," she received four years of trauma, first from the abuse and then from the Defendants' response and retaliation, causing Jane Doe emotional and psychological injuries that have and will negatively impact her for life.

151.    Since her first suicide attempt in January of 2018, Jane Doe has received emergent and routine mental health care and treatment that included drug therapy with Prozac and Prazosin.

152.    Jane Doe was diagnosed at that time with adjustment disorder and depressed mood associated with the difficulty of adjusting to the United States which coincided with the typical challenges of adolescence and high school.

153.    During her psychiatric evaluation, Jane Doe disclosed that during her holiday break in Honduras the month before, she was sexually abused by a "family friend." Her mother discovered the abuse, blamed Jane Doe, and refused to speak to her, further straining their difficult relationship.

154.    Jane Doe did not disclose during that evaluation that Jackson had sexually abused her repeatedly during her freshman year, or that the same "family friend" had been sexually abusing her since she was 6 years old.

155.    After Jackson's abuse was reported in November of 2018, Jane Doe also revealed the sexual abuse committed against her as a young child in Honduras. These disclosures increased Jane Doe's anxiety and depression. She continued to threaten and did attempt suicide.

156.    While Jane Doe confirmed that the abuse she suffered at the hands of Jackson traumatized, embarrassed, and humiliated her, she also found herself concerned for her abuser and his daughter and for how the criminal prosecution would affect their lives.

157.    Jane Doe's relationship with her mother also further deteriorated precipitously. Her mother provided no support and was verbally abusive.

158.    Jane Doe also confirmed suffering from impulsivity, persistent negative thoughts, problems focusing, symptoms of feeling irritable and anxious, depressed mood, self-harm, and feeling isolated from family and friends.

159.    By January of 2019, Jane Doe was "having a difficult time focusing in school," had been experiencing an "increase in unhealthy risk taking" and a negative view of herself as a result. She reported being chronically sad and "continued difficulty with feeling ostracized within peer group."

160.    When her senior year at Mercy High School began, Jane Doe's negative feelings continued to intensify while her functioning continued to decline.

161.    By Thanksgiving and only six weeks before Jackson's criminal trial for which Jane Doe was subpoenaed to testify and attend, Principle Blakeslee suspended her twice for unsubstantiated claims of buying Adderall and consuming alcohol.

162.    By the time of Jackson's plea for which he received no prison time, Jane Doe was chronically sad and feeling completely isolated and rejected by her friends. Her social struggles at school also increased her anxiety. Jane Doe started spending all of her free time at school, including eating lunch, in bathroom stalls because she had no friends.

163.    An evaluation on January 30, 2020, by a board certified clinical and forensic psychiatrist corroborated Jane Doe's diagnosis of Adjustment Disorder with depressed mood and

31

considered these conditions chronic.

164.    The psychiatrist also determined that Jane Doe, like other children of sexual abuse, will require years of mental health treatment to appreciate the full meaning and consequences of their relationship with an abuser and to understand the abuse and address its negative emotional, behavioral, and cognitive consequences and to understand that regardless of their behavior the adult abuser is always responsible for the abuse.

165.    Jane Doe will also require intensive therapy to help her develop social, emotional, and cognitive skills to avoid further sexual victimization and exploitation. This is especially true because Jane Doe's history of sexual abuse in childhood significantly magnified the consequences of Jackson's abuse, and her vulnerability to be abused.

166.    As a direct and proximate result of the Defendants' acts, omissions, and deliberate indifference in response to actual notice, Plaintiff Jane Doe has suffered severe psychological, emotional, and physical injuries, emotional distress arising from the physical injuries, pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, the inability to lead a normal or productive life, shame, humiliation and regression, and costs associated with medical/psychological care and treatment.

## CAUSES OF ACTION

### COUNT I - Negligent Hiring
**(Mercy High School, Board of Trustees, Sisters of Mercy & Mercy Education System)**

167.    Jane Doe repleads and incorporates each and every allegation set forth above and states:

168.    As a Maryland educational institution, Defendant Mercy High School owed Jane Doe, a student and minor, a special duty of trust and confidence to protect her from harm and

ensure her safety and well-being.

169.    As the governing body responsible to establish the policies of Mercy High School, a Maryland educational institution, Defendant Board of Trustees owed Jane Doe, a student and minor, a special duty of trust and confidence to protect her from harm and ensure her safety and well-being.

170.    As the entities contractually responsible for oversight and control of Mercy High School's Board of Trustees, the governing body responsible to establish the policies for Mercy High School, a Maryland educational institution, Defendants Sister of Mercy and Mercy Education System owed Jane Doe, a student and minor of their sponsored school, a special duty of trust and confidence to protect her from harm and ensure her safety and well-being.

171.    At all relevant times, the Defendants knew that the Archdiocese's Policy and applicable law mandated Mercy High School to process candidates for employment according to hiring policies and procedures to determine their eligibility for employment and suitability to work with minors.

172.    In contravention of the duty owed by the Defendants to Jane Doe to protect her from harm while she was enrolled at Mercy High School, Defendants Mercy High School, through its Board of Trustees, administrators, faculty and staff, Sisters of Mercy, and Mercy Education System breached their duty to protect Jane Doe, jointly and severally, as follows:

   a.  failing to supervise Jackson according to the Archdiocese's Policy, relying on the recommendation of Director Gill rather than following mandated hiring policies and procedures to employ Jackson to coach Mercy High School's students/minors.

   b.  failing to ensure that all hiring procedures were completed as required by the Archdiocese's Policy and/or applicable law before employing Jackson to coach students/minors at Mercy High School;

   c.  failing to ensure the completion of all documentation required by the Archdiocese's Policy and/or applicable law before employing Jackson to coach students/minors at Mercy High School;

d. failing to process Jackson through the CJIS Fingerprint-based Criminal History Record Information check as required by the Archdiocese's Policy and/or applicable law before employing Jackson to coach students/minors at Mercy High School;

e. failing to require Jackson to provide a minimum of three professional references as required by the Archdiocese's Policy before employing Jackson to coach students/minors at Mercy High School;

f. failing to check and document the professional references that Jackson was required to provide as required by the Archdiocese's Policy before employing Jackson to coach students/minors at Mercy High School;

g. failing to review publicly available information to discover Jackson's 2008 conviction for first and second degree assault that made him ineligible for employment pursuant to the Archdiocese's Policy and applicable law but hiring him nonetheless to coach students/minors at Mercy High School;

h. failing to review publicly available information to discover Jackson's 2008 DWI conviction for driving while impaired, including while transporting a minor, before employing Jackson to coach students/minors at Mercy High School but hiring him nonetheless to coach students/minors at Mercy High School;

i. failing to review publicly available information to discover whether Jackson was the subject of a 2013 domestic violence protective order but hiring him nonetheless to coach students/minors at Mercy High School;

j. failing to review any other publicly available information to discover whether Jackson was suitable to coach minors but hiring him nonetheless to coach students/minors at Mercy High School;

k. in President Lennon's update to parents about Jackson's criminal charges, permitting President Lennon to falsely represent to parents that Mercy High School's hiring process complies with all federal, state, and local employment laws when those very laws were violated to hire Jackson who was ineligible for employment (Exhibit No. 2);

l. in President Lennon's update to parents about Jackson's criminal charges, permitting President Lennon to falsely represent to parents that candidates for employment undergo a fingerprint criminal background check through the FBI's Criminal Justice Identification Services (CJIS) Division when Jackson could not have been fingerprinted and processed through CJIS because his criminal history made him ineligible and unsuitable to coach minors; and

m. any other breaches of hiring policies, procedures, and laws.

34

173.    As a direct and proximate result of the Defendants' breach of their fiduciary duty, Jane Doe has suffered severe psychological, emotional, and physical injuries, and emotional pain and distress accompanied by physical manifestations (such as weight gain, elevated heart rate, nightmares, night terrors, and inability to sleep), pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, inability to lead a normal life, shame, humiliation and regression, and costs associated with medical/psychological care and treatment. Jane Does' injuries and damages are permanent and continuing in nature causing her to suffer such losses in the future.

**WHEREFORE,** Plaintiff demands compensatory damages well in excess of $75,000, costs and expenses, including attorneys' fees, enhanced compensatory damages as permitted by law, punitive damages, and all other and further relief that justice may require.

## COUNT II - Negligent Supervision, Retention & Training
### (Mercy High School, Board of Trustees, Sisters of Mercy & Mercy Education System)

174.    Jane Doe repleads and incorporates each and every allegation set forth above and states:

175.    Mercy High School, its Board of Trustees, Sisters of Mercy, and Mercy Education System owed Jane Doe, a student and minor, a special duty to protect her from harm and ensure her safety and well-being.

176.    As a Maryland educational institution, Defendant Mercy High School owed Jane Doe, a student and minor, a special duty of trust and confidence to protect her from harm and ensure her safety and well-being.

177.    As the governing body responsible to establish the policies of Mercy High School, a Maryland educational institution, Defendant Board of Trustees owed Jane Doe, a student and

minor, a special duty of trust and confidence to protect her from harm and ensure her safety and well-being.

178.    As the entities contractually responsible for oversight and control of the Board of Trustees, the governing body responsible to establish the policies for Mercy High School, a Maryland educational institution, Defendants Sister of Mercy and Mercy Education System owed Jane Doe, a student and minor of their sponsored school, a special duty of trust and confidence to protect her from harm and ensure her safety and well-being.

179.    At all relevant times, the Defendants knew that the Archdiocese's Policy and applicable law mandated Mercy High School to properly supervise, retain and train its employees according to the Archdiocese's Policy and applicable law to ensure that, at all times, faculty and staff remain eligible and suitable for employment and to work with minors.

180.    In contravention of the duty owed by the Defendants to Jane Doe to protect her from harm while she was enrolled at Mercy High School, Defendants Mercy High School, through its Board of Trustees, administrators, faculty and staff, Sisters of Mercy, and Mercy Education System breached their duty to protect Jane Doe, jointly and severally, as follows:

    a.  failing to protect Jane Doe, then a minor, from sexual abuse and harassment;

    b.  failing to implement instruction, training, and policies to prevent, recognize and report child sexual abuse required by the Archdiocese's Policy and applicable law;

    c.  failing to train faculty, staff, and coaches to prevent, recognize, and report abuse and misconduct with minors as required by the Archdiocese's Policy and applicable law;

    d.  failing to train faculty, staff, and employees to respond to disclosures by minors or their parents or guardians of child sexual abuse or reports of boundary-violating behaviors of adults or minors in a supportive and appropriate manner that meets mandated reporting requirements under Maryland law;

    e.  failing to create a *Code of Conduct* or implement the *Code of Conduct for Church Personnel of the Archdiocese of Baltimore*, the companion to the

Archdiocese's Policy, to apprise the faculty, staff, and employees of Mercy High School of conduct that is prohibited when working with students to promote open and trustworthy relationships between minors and adults;

f.   failing to train faculty, staff, and employees to recognize behavior that constitutes adult perpetration;

g.   failing to properly investigate, correct, report, or otherwise address Jackson's inappropriate conduct with A.C. that constituted Misconduct with a Minor as required by the Archdiocese's Policy;

h.   failing to implement and/or enforce policies and rules prohibiting employees, including Jackson, from messaging students through social media unless expressly authorized;

i.   failing to implement and/or enforce policies and rules that prohibit or limit faculty, staff, and employees from working alone with students. especially outside of normal school hours;

j.   failing to implement and/or enforce policies and rules prohibiting faculty, staff, and employees from privately messaging students through social media unless expressly authorized by Mercy High School;

k.   failing to prevent retaliation against Jane Doe after Jackson's sexual abuse was reported;

l.   retaliating against Jane Doe for reporting and/or confirming reports that she was sexually abused by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her; and

m.   other breaches of supervision, retention, or training of faculty, staff, and employees.

181.    As a direct and proximate result of the Defendants' breach of their duty, Jane Doe has suffered severe psychological, emotional, and physical injuries, and emotional pain and distress accompanied by physical manifestations (such as weight gain, elevated heart rate, nightmares, night terrors, and inability to sleep), pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, inability to lead a normal life, shame, humiliation and regression, and costs associated with medical/psychological care and treatment.

Jane Does' injuries and damages are permanent and continuing in nature causing her to suffer such losses in the future.

**WHEREFORE,** Plaintiff demands compensatory damages in excess of $75,000, costs and expenses, including attorneys' fees, enhanced compensatory damages as permitted by law, punitive damages, and all other and further relief that justice may require.

### COUNT III – Gross Negligence
### (Mercy High School and Board of Trustees)

182.    Jane Doe repleads and incorporates each and every allegation set forth above and states:

183.    As a Maryland educational institution, Defendant Mercy High School owed Jane Doe, a student and minor, a manifest duty, based in policy and law, to refuse employment to any person who is disqualified by criminal conviction and/or unsuitable to work with minors to protect Jane Doe from harm and to ensure her safety and well-being.

184.    As the governing body responsible to establish the policies of Mercy High School, a Maryland educational institution, the Board of Trustees of Mercy High School owed Jane Doe, a student and minor, a manifest duty, based in policy and law, to refuse employment to any person who is disqualified by criminal conviction and/or unsuitable to work with minors to protect Jane Doe from harm and to ensure her safety and well-being.

185.    Counts I and II above are specifically incorporated here and demonstrate that the Defendants intentionally failed to perform their manifest duty to process and screen Jackson for employment and train him as required by the Archdiocese's Policy and procedures and applicable law that governs hiring and training mandates for employees.

186.    The Defendants intentional failure to comply with required hiring and training mandates as set forth in factual detail in Counts I and II incorporated here were in reckless disregard

of and/or indifference to the consequences of these failures that directly provided Jackson with access to target, groom, and abuse Jane Doe causing her serious harm and injuries.

187.    As a direct and proximate result of the Defendants' breach of their manifest duty, Jane Doe has suffered severe psychological, emotional, and physical injuries, and emotional pain and distress accompanied by physical manifestations (such as weight gain, elevated heart rate, nightmares, night terrors, and inability to sleep), pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, inability to lead a normal life, shame, humiliation and regression, and costs associated with medical/psychological care and treatment. Jane Does' injuries and damages are permanent and continuing in nature causing her to suffer such losses in the future.

**WHEREFORE,**  Plaintiff demands compensatory damages well in excess of $75,000, costs and expenses, including attorneys' fees, enhanced compensatory damages as permitted by law, punitive damages, and all other and further relief that justice may require.

## COUNT IV – Breach of Fiduciary Duty
**(Mercy High School, Board of Trustees, Sisters of Mercy & Mercy Education System)**

188.    Jane Doe repleads and incorporates each and every allegation set forth above and states:

189.    At all relevant times, Jane Doe was a minor and vulnerable youth entrusted to the care of the Defendants.

190.    As a Maryland educational institution, Defendant Mercy High School owed Jane Doe, a student and minor, a fiduciary duty of trust and confidence to protect her from harm, ensure her safety and well-being, and act in her best interest.

191.    As the governing body responsible to establish the policies of Mercy High School,

a Maryland educational institution, Defendant Board of Trustees owed Jane Doe, a student and minor, a fiduciary duty of trust and confidence to protect her from harm, ensure her safety and well-being, and act in her best interest.

192.    As the entities contractually responsible for oversight and control of the Board of Trustees, the governing body responsible to establish the policies for Mercy High School, a Maryland educational institution, Defendants Sister of Mercy and Mercy Education System owed Jane Doe, a student and minor of their sponsored school, a fiduciary duty of trust and confidence to protect her from harm, ensure her safety and well-being, and act in her best interest.

193.    The Defendants breached their fiduciary duty to Plaintiff as set forth herein, particularly in the ways described in Counts I – III for negligence and gross negligence.

194.    The actions and/or omissions of the Defendants were willful, wanton, malicious, reckless, negligent and outrageous in their disregard for the rights and safety of Plaintiff.

195.    As a direct and proximate result of the Defendants' breach of their fiduciary duty, Jane Doe has suffered severe psychological, emotional, and physical injuries, and emotional pain and distress accompanied by physical manifestations (such as weight gain, elevated heart rate, nightmares, night terrors, and inability to sleep), pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, inability to lead a normal life, shame, humiliation and regression, and costs associated with medical/psychological care and treatment. Jane Does' injuries and damages are permanent and continuing in nature causing her to suffer such losses in the future.

**WHEREFORE,**  Plaintiff demands compensatory damages well in excess of $75,000, costs and expenses, including attorneys' fees, enhanced compensatory damages as permitted by law, punitive damages, and all other and further relief that justice may require.

40

**COUNT V – Violation of 20 U.S.C. § 1681 *et seq.***
**Title IX, Education Amendments of 1972**
**(Mercy High School & Board of Trustees – Early 2017)**

196.    Jane Doe repleads and incorporates each and every allegation set forth above and states:

197.    At all relevant times, Defendant Mercy High School was a recipient of federal education funding within the meaning of Title IX, 20 U.S.C. § 1681 (a).

198.    Students attending Mercy High School, including Jane Doe, had a right to not be subject to sexual harassment or abuse while they attended Mercy High School.

199.    In early 2017, A.C. and her parents reported to the administration that Jackson had infringed on A.C.'s personal boundaries by touching, hitting, or otherwise placing his hand on her upper thigh, and harassing her.

200.    Jackson's conduct infringed on A.C.'s personal boundaries and therefore violated the Archdiocese's Policy that prohibits Misconduct with a Minor or Sexual Abuse.

201.    In response to A.C.'s grievance, President Lennon and/or Principal Blakeslee met with A.C. and instructed her to quit track if her stepfather did not want her in contact with Jackson. They also met with Director Gill, A.C.'s parents, and Jackson, who admitted to the inappropriate contact, and according to Director Gill because "the allegations didn't seem weren't (sic) of a sexual nature…it just ended right there."

202.    Mercy High School's response was therefore inadequate and violated the Archdiocese's Policy that required an investigation, a written report of the investigation's findings, appropriate personnel action that may include termination, notification to civil authorities if appropriate, and an assessment of the accused's fitness for working with minors, among other required actions.

203.    Mercy High School and its Board of Trustees were therefore on actual notice of Jackson's propensity to engage in misconduct with a minor and/or commit sexual harassment and sexual abuse upon A.C. and therefore other students, including Jane Doe.

204.    Mercy High School and the Board of Trustees, with actual notice, had the responsibility to conduct a prompt, reliable, thorough, and impartial investigation into Jackson's misconduct and/or sexual abuse of A.C., which they failed to do upon receiving a complaint about Jackson's inappropriate conduct.

205.    Mercy High School and the Board of Trustees, with actual notice, had the authority to address Jackson's misconduct and/or abuse of A.C. and institute corrective measures. Instead, Defendants conducted no meaningful investigation, disciplinary action, or corrective measures and, their response was perfunctory, superficial, insufficient, and wholly inadequate to address the misconduct and protect students, including Jane Doe.

206.    Despite receipt of actual notice, Mercy High School and the Board of Trustees, and their agents and representatives, acted with deliberate indifference in failing to respond to Jackson's misconduct and/or abuse as required by the Archdiocese's Policy.

207.    As a result of their gross failure to act and investigate Jackson's misconduct and/or abuse of A.C., Jackson was free to abuse and did sexually abuse Jane Doe.

208.    As a direct and proximate result of the Defendants' deliberate indifference in response to actual notice, Jane Doe was denied equal access to educational opportunities or benefits and has suffered severe psychological, emotional, and physical injuries, and emotional pain and distress accompanied by physical manifestations (such as weight gain, elevated heart rate, nightmares, night terrors, and inability to sleep), pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, inability to lead a normal life, shame,

humiliation and regression, and costs associated with medical/psychological care and treatment. Jane Does' injuries and damages are permanent and continuing in nature causing her to suffer such losses in the future.

   **WHEREFORE,**  Plaintiff demands compensatory damages well in excess of $75,000, costs and expenses, including attorneys' fees, enhanced compensatory damages as permitted by law, punitive damages, and all other and further relief that justice may require.

### COUNT VI – Retaliation in Violation of 20 U.S.C. § 1681 *et seq.*
### Title IX, Education Amendments of 1972
### (Mercy High School)

   209.    Jane Doe repleads and incorporates each and every allegation set forth above and states:

   210.    At all relevant times, Defendant Mercy High School was a recipient of federal education funding within the meaning of Title IX, 20 U.S.C. § 1681 (a).

   211.    Immediately after Jane Doe reported/confirmed that Jackson had sexually abused her, a protected activity under Title IX, Principal Blakeslee and therefore Mercy High School retaliated against Jane Doe by conducting unauthorized investigations of Jackson's abuse, improper interrogations of Jane Doe, including requesting her peers to confront her about denying the abuse.

   212.    Jane Doe also believed that Principal Blakeslee either did not believe that Jackson abused her or that Jane Doe had "willingly participated" and was in a "sexual relationship" with Jackson.  Therefore, Jane Doe believed that Principal Blakeslee blamed her for damaging the school's reputation, among other things, and wanted Jane Doe to leave Mercy High School.

   213.    Jane Doe's beliefs were corroborated when Principal Blakeslee suspended her on two separate occasions based on unfounded reports made by other students who disliked Jane Doe

because of her abuse allegations against Jackson.  Not only can suspensions lead to expulsion, but Mercy High School affirmatively reports suspensions to colleges (See Handbook's Code of Conduct, Suspensions).

214.    Some other instances of Mercy High School's retaliation against Jane Doe concerned contrived claims that her skirt was too short in violation of uniform regulations; denying Jane Doe's request to attend school remotely because she felt harassed and bullied by other students while allowing another student to attend remotely for a physical injury; and disregarding Jane Doe's complaint that her photography teacher had placed her in danger by demanding that she take a photograph too close to oncoming traffic.

215.    In response to Jane Doe confirming and reporting Jackson's sexual abuse, a protected activity, Principal Blakeslee and therefore Mercy High School took adverse actions against Jane Doe to force her to leave Mercy High School or be expelled, and/or be rejected from colleges of her choice because of reported suspensions.

216.    As a direct and proximate result of the Defendants' retaliation, Jane Doe has was denied equal access to educational opportunities or benefits and has suffered severe psychological, emotional, and physical injuries, and emotional pain and distress accompanied by physical manifestations (such as weight gain, elevated heart rate, nightmares, night terrors, and inability to sleep), pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, inability to lead a normal life, shame, humiliation and regression, and costs associated with medical/psychological care and treatment. Jane Does' injuries and damages are permanent and continuing in nature causing her to suffer such losses in the future.

**WHEREFORE,**  Plaintiff demands compensatory damages well in excess of $75,000, costs and expenses, including attorneys' fees, enhanced compensatory damages as permitted by law, punitive damages and all other and further relief that justice may require.

44

## COUNT VII – Fraudulent Conveyance
### (Mercy High School, Board of Trustees & Mercy High School Asset Management)

217.    Jane Doe repleads and incorporates each and every allegation set forth above and states:

218.    Under Maryland law, a creditor "is a person who has any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent."

219.    Therefore, Jane Doe is a creditor of Mercy High School, the Board of Trustees and Mercy High School Asset Management. Md. Code Ann., Comm. Law ("CL") § 15-201 (d).

220.    Under the Maryland Uniform Fraudulent Conveyance Act every conveyance made and every obligation incurred by a person or business who is or will be rendered insolvent or with unreasonably small capital is fraudulent as to creditors without regard to actual intent, if the conveyance is made or the obligation incurred without fair consideration. *See* Md. Ann. Code, Commercial Law §§ 15-204 and 15-205, or other applicable law or statute.

221.    In addition to their contractual partnership, the Sisters of Mercy and Mercy High School conveyed and reconveyed Mercy High School's most valuable asset, the real property where Mercy High School is situated ("Subject Property"), for nominal consideration.

222.    SDAT's current legal description of the Subject Property is 23.396 acres with a valuation of $7,755,600.00.

223.    On 06/26/1973, Mercy High School, Inc. conveyed to the Sisters of Mercy,[12] for $5.00, the Subject Property that includes the physical location of Mercy High School with an address of 1300 E. Northern Parkway, Baltimore, MD 21239.

---

[12] At the time of the conveyance, the Sisters of Mercy of the Union in the United States of America Province of Baltimore, Inc., later the Sisters of Mercy of Baltimore, Inc., was one of the regional communities that merged into the Sisters of Mercy of the Americas South Central Community, Inc. in 2008.

224.    In 2008, less than a year after Mercy High School formed Mercy High School Asset Management, LLC, the Sisters of Mercy of Baltimore, Inc., for $5.00, reconveyed the same real property to Mercy High School, through its wholly owned asset management company, Mercy High School Asset Management.

225.    The 2008 conveyance occurred at a time when Catholic institutions, including the Irish Order of the Sisters of Mercy, were being investigated and/or mired in litigation concerning the widespread abuse of children in their care over decades, which was covered up and therefore not reported. Consequently, Catholic institutions began to create new entities and/or trusts to hold their assets in an attempt to shield them from creditors.

226.    On information and belief, Mercy High School Asset Management is one such entity created to shield Mercy High School's assets from creditors, such as Jane Doe.

227.    At the time that Mercy High School, by and through the Board of Trustees, transferred assets to Mercy High School Asset Management, Defendants believed and/or reasonably should have believed that they would incur debts beyond their ability to pay such debts to any creditor including student victims of abuse by faculty, staff, or an employee of Mercy High School, such as Jane Doe, as the liability for debts matured.

228.    The transfer of assets rendered Mercy High School and the Board of Trustees insolvent and/or grossly undercapitalized.

229.    The conveyances were made for the benefit of Defendants, and to the detriment and prejudice of creditors such as Jane Doe.

WHEREFORE, Jane Doe requests that the Court charge upon Mercy High School Asset Management and the Subject Property a constructive trust for the benefit of Jane Doe, or award a judgment against Mercy High School, Board of Trustees, and Mercy High School Asset Management, jointly and severally, in the amounts awarded to Jane Doe under any of the other

46

Counts I – VI above that seek compensatory damages well in excess of $75,000, costs and expenses, including attorneys' fees, enhanced compensatory damages as permitted by law, punitive damages and all other and further relief that justice may require.

## ATTORNEYS' FEES & COSTS ALLOWED BY LAW

In compliance with Rule 2-703 (b), a party seeking attorneys' fees from another party shall include a claim for fees in the party's initial pleading.  In Counts V and VI above, Jane Doe sues the Defendants for violations of Title IX, Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*) and therefore pursuant to 42 U. S. C. §1988, the court, in its discretion, may allow the prevailing party, reasonable attorneys' fee as part of the costs, including expert fees.  Consequently, if Jane Doe is awarded damages under Title IX, Jane Doe is entitled to request an award of reasonable attorneys' fees.

Date    04/10/2023                          Respectfully submitted.

*Steven H. Heisler /AKK*
Steven H. Heisler, 8812150283
The Law Offices of Steven H. Heisler, LLC
1011 North Calvert Street
Baltimore, MD 21202
T: 410.625.4878  F: 410.659.7111
*sheisler@injurylawyermd.com*

*Amy K. Kline*
Amy K. Kline, 8812160022
Amy K. Kline Law
35 Franklin Boulevard
Reisterstown, MD 21136
T: 410.526.9551  F: 410.526.9554
*akline@amyklinelaw.com*