## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**JANE DOE,**

       *Plaintiff*,

    **v.**                               **Civil No.: 1:23-cv-01184-JRR**

**MERCY HIGH SCHOOL, INC.,** *et al.*,

       *Defendants*.

---

## <u>MEMORANDUM OPINION</u>

Pending before the court are two motions: Defendants Sisters of Mercy of the Americas, Inc., Sisters of Mercy of the Americas South Central Community, Inc., and Mercy Education System of the Americas, Inc.'s Motion to Dismiss Counts I, II, IV, and VIII (ECF No. 34; the "SOM and MESA Defendants' Motion"), and Defendant Mercy High School, Inc., Board of Trustees of Mercy High School, Inc., and Mercy High School Asset Management, LLC's Motion to Dismiss (ECF No. 35; the "Mercy High School Defendants' Motion").  The court has reviewed all papers; no hearing is necessary.  Local Rule 105.6 (D. Md. 2023).

## I.    BACKGROUND[1]

In 2016, Jane Doe, a 14-year-old girl who had recently immigrated to the United States from Honduras, began attending Mercy High School, Inc. ("Mercy High School") as a freshman. (ECF No. 33 ¶ 1.)

### A.  Defendants' Organizational and Operational Structure

Mercy High School is an all-girls, private Catholic college preparatory school in Baltimore,

---

[1] For purposes of resolving the pending motions, the court accepts as true all well-pled facts set forth in the Amended Complaint.  (ECF No. 33.)  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

Maryland.  *Id.* ¶ 9.  While Plaintiff attended Mercy High School, Jeanne Blakeslee was the principal.  *Id.* ¶ 10.  Principal Blakeslee reported to Mercy High School President Mary Beth Lennon.  *Id.*  President Lennon, as the highest-ranking administrator of Mercy High School, reported to the Board of Trustees for Mercy High School (the "BOT").  *Id.*  The BOT is the "governing body" responsible for establishing Mercy High School's policies and "is supervised by and under the control of" the Sisters of Mercy of the Americas, Inc. ("SOM"), the Sisters of Mercy of the Americas South Central Community, Inc. ("SOM South Central"), and Mercy Education System of the Americas, Inc. ("MESA").  *Id.* ¶¶ 11, 171.

SOM and SOM South Central formed MESA in 2017 and "delegated to it the authority and responsibility to oversee their sponsored schools," including Mercy High School.  (ECF No. 33 ¶ 14.)  The BOT also "controls and manages Mercy High School's assets held by Mercy High School Asset Management" ("MHSAM"), a wholly-owned subsidiary of Mercy High School.  *Id.* ¶ 11.  MHSAM was formed in 2007 to "hold the assets of Mercy High School."  *Id.* ¶ 12.  Plaintiff alleges MHSAM was formed "to shield the assets from creditors by rendering Mercy High School insolvent and/or grossly undercapitalized."  *Id.*  In 2008, the Sisters of Mercy of Baltimore, Inc., reconveyed the real property where Mercy High School was located to MHSAM for $5.00 (the "2008 Real Property Transaction").  *Id.* ¶ 225.  Relatedly, on June 17, 2022, MHSAM purchased real property in Baltimore City for $140,000 for the "exclusive benefit" of Mercy High School (the "2022 Real Property Transaction").  *Id.* ¶ 230.  Finally, on October 5, 2022, Mercy High School (as landlord) amended its "lucrative" Tower Lease Agreement with New Cingular (as tenant), and transferred its interest in the lease to MHSAM for zero consideration (the "2022 Tower Lease Transaction").  *Id.* ¶ 232.  As a result of the above conveyances, Mercy High School and the BOT are "insolvent and/or grossly undercapitalized."  (ECF No. 33 ¶ 235.)

At all times relevant, SOM and SOM South Central have "sponsored" Mercy High School as a Catholic educational institution in accordance with a contract Plaintiff "believe[s] to be the Covenant." *Id.* ¶¶ 17, 19.  The Covenant sets forth the contractual rights and obligations of SOM, SOM South Central, and Mercy High School with respect to the "sponsorship" relationship. *Id.* ¶ 21.  Under the Covenant, Mercy High School agrees to participate in MESA, "to grant MESA reserved governance powers and control over" its BOT, and to obtain MESA's consent before the BOT "is authorized to take its most critical and basic functions." *Id.* ¶ 22.  The Covenant similarly requires MESA, acting on behalf of SOM and SOM South Central, to "ensure that [the BOT] fulfills its fiduciary duties to set the direction of the school and establish its policies and programs" to educate the students of the school with a "Mercy Education." *Id.* ¶ 23.  A "Mercy Education" incorporates the "Five Critical Concerns of the Sisters of Mercy," including "[n]onviolence and preventing violation and abuse of women and children." *Id.* ¶¶ 24–26.

Mercy High School's Student/Parent Handbook "adopts and follows the Archdiocese of Baltimore's *Statement of Policy for the Protection of Children and Youth*" (the "Archdiocese's Policy").  (ECF No. 33 ¶ 27.)  Pursuant to their contractual responsibility for Mercy High School policies, SOM, SOM South Central, and MESA are "aware" and "sanction" the adoption of the Archdiocese's Policy.[2]  *Id.*

**B.  Jackson's Employment with Mercy High School**

In 2015, Mercy High School hired Ernest Jackson, IV, as an assistant indoor track coach. *Id.* ¶ 1.  In his role, Jackson reported to Track Team Coach Eric Coles and Athletic Director Nicholas Gill.  *Id.* ¶ 57.  Director Gill recruited Jackson for the position. *Id.* ¶ 37.  Jackson was a

---

[2] Plaintiff contends that Mercy High School's adoption of the Archdiocese's Policy is "unsound and irresponsible," given the Archdiocese's "history of failing to protect children from sexual abuse," the Archdiocese's Policy's inapplicability to faculty and staff, as well as its failure to require students to report sexual abuse of their classmates. (ECF No. 33 ¶¶ 28, 34.)

childhood friend of Director Gill's younger brother. (ECF No. 33 ¶ 37.)  Under the Archdiocese's Policy, before employing Jackson, Mercy High School was required to have Jackson submit to "a CJIS Fingerprint-based Criminal History Record Information Check" and an "internet Criminal History Screening," as well as provide three professional references.  *Id.* ¶¶ 39, 40.  The Archdiocese's Policy and Maryland law prohibited Mercy High School "from hiring or retaining an employee who has been convicted of certain crimes," including first degree assault.  *Id.* ¶ 41 (citing MD. CODE ANN., EDUC. §§ 6-113(a)(3), 2-206.1(a)(3), 14-101(a)(21)).

At the time Mercy High School hired him, Jackson had the following criminal record, which was publicly available on the Maryland Judiciary Case Search webpage:

> **2008 DWI While Transporting a Minor:** on May 16, 2008, Jackson was found guilty and incarcerated for driving while impaired by alcohol while transporting a minor on August 11, 2007 (*State of Maryland v. Jackson, Ernest*, Case No. 03-K-08-000785).

> **2008 Conviction First Degree Assault:** on 10/13/2007, Jackson was arrested for first and second degree assault. He was subsequently indicted and found guilty of first degree assault in 2008. He received a 10 year sentence with 9 years, 6 months suspended and 5 years of probation. Thereafter, he violated his probation on eight separate occasions, the last in April of 2014 (*State of Maryland v. Ernest Jackson IV*, Case No. 03-K-07-005077 and 2C00286337).

> **2013 Civil Contempt Child Custody & Support Matter:** in July of 2013, Jackson was sued for custody and child support. During the seven year pendency of this matter, Jackson was found in continuing contempt and child support arrears. Sole custody was granted to the child's mother (*Zacharski v. Jackson*, Case No. 03-C-13-007821).

> **2013 Domestic Violence:** in August of 2013, a protective order was filed against Jackson for domestic violence and granted. He was finally ordered not to abuse, not contact, not to enter residence, stay away from employment, and surrender firearms (*In Re: Ernest Jackson,* Case No. 0804-SP-05039-2013)

> **2014 DWI:** on January 18, 2014, Jackson was charged with driving while impaired with alcohol, unsafe lane changing, and excessive

speed. He was subsequently found guilty of driving while impaired with alcohol, incarcerated, and ordered to undergo treatment for alcohol abuse (*State of Maryland v. Ernest Jackson IV*, Case No. 20H0B0N).

**2015 Driving w/ Suspended License:** on April 10. 2015, Jackson was charged with driving with a suspended license. He was found guilty on 08/19/2015 and received probation before judgment (*State of Maryland v. Ernest Jackson IV,* Case No. 03M0JGQ).

*Id.* ¶ 43.

Pursuant to the Archdiocese's Policy and Maryland law, Jackson's first degree assault conviction disqualified him from employment with Mercy High School. *Id.* ¶ 42. Further, Plaintiff alleges that Jackson's publicly available criminal record of "alcohol abuse, including endangering a minor while driving intoxicated . . . demonstrate that he was unsuitable to work with minors." (ECF No. 33 ¶ 42.) In addition to the above-recited criminal record, in 2015, mere months before being hired at Mercy High School, Jackson raped a 15-year-old girl in her home. *Id.* ¶ 45. He was later convicted of the act in 2019. *Id.* Plaintiff contends that "a proper check of Jackson's references may have revealed his inappropriate contact" with that rape victim and prevented his access to, and abuse of, Plaintiff. *Id.* Instead, Mercy High School hired Jackson solely on Director Gill's recommendation (based on a family friendship) and "did not follow its own policy or Maryland law when it hired Jackson despite his ineligibility for employment." *Id.* ¶¶ 38, 46.

### C.  Plaintiff's Attendance at Mercy High School

Before Plaintiff moved to the United States, her parents applied for her to attend Mercy High School "because of its representations that it provided a rigorous education marked by academic excellence and personal attention while maintaining and promoting a healthy and safe environment for all students." *Id.* ¶¶ 47–49. They also "believed that an all-girls Catholic school could benefit their highly intelligent daughter because it did not have the added distraction of

boys." *Id.* ¶ 49.

Shortly after she started school, Plaintiff tried out for the indoor track team. That is how she met Jackson – then in his late 20s. (ECF No. 33 ¶ 56.) Throughout her freshman year, Jackson subjected Plaintiff to multiple forms and instances of sexual abuse while at school, ranging from flirtation to physical sexual assault, including forced oral sodomy, attempted vaginal rape, and anal rape. *Id.* ¶¶ 58–59, 62–63, 65. The abuse occurred both "during school hours and at night, between the time they returned to Mercy High School after track meets and before her father picked her up." *Id.* ¶ 64. Some Mercy High School students and staff were aware of Jackson's inappropriate attention and contact with Plaintiff, including a security guard who is believed to have failed to report Jackson to school administration, and Plaintiff's friends to whom she disclosed the abuse and relationship. *Id.* ¶¶ 67–70.

Jackson did not sexually abuse Plaintiff during her sophomore year, although he messaged her on social media. (ECF No. 33 ¶ 71.) Jackson renewed his sexual abuse of Plaintiff in the fall term of her junior year, with the last incident occurring on November 13, 2018. *Id.* ¶¶ 73, 87. Jackson's repeated and on-going sex abuse and molestation of Plaintiff resulted in physical and emotional harm to Plaintiff. *Id.* ¶ 65 and *passim*.

### D. Reports of the Abuse

Based on her personal observations and awareness of rumors among students, Plaintiff believed (at the time) that Jackson had a sexually inappropriate relationship with another minor student, A.C., during Plaintiff's sophomore year. *Id.* ¶¶ 71, 77. A.C. and her parents reported Jackson to Mercy High School administration in January of 2017—specifically, that Jackson "struck" A.C.'s upper thigh while she was sleeping on a school bus trip. *Id.* ¶¶ 78–79. Director Gill learned of the inappropriate contact and reported it to the Mercy High School administration.

*Id.* ¶ 81.  Principal Blakeslee and President Lennon met with Jackson, Director Gill, and A.C.'s parents about the complaint; Jackson admitted he touched A.C. on her upper thigh.  (ECF No. 33 ¶ 82.)  According to Director Gill, because the touching did not "seem" to be of a "sexual nature," the matter concluded with that meeting and no further action was taken.  *Id.*  Mercy High School's treatment of the A.C. complaint violated the Archdiocese's Policy, which required "an investigation, a written report of the investigation's finding, appropriate personnel action . . . , notification to civil authorities if appropriate, and assessment of the accused's fitness for working with minors."  *Id.* ¶¶ 83–84.

On November 19, 2018, following Jackson's last instance of abuse of Plaintiff, a group of students reported Jackson's abuse of Plaintiff to Coach Coles, who then notified Principal Blakeslee and/or President Lennon.  *Id.* ¶ 89.  Mercy High School reported Jackson's sexual abuse to Child Protective Services ("CPS").  Following that, in violation of the Archdiocese's Policy, school counselor Kathleen Gerwin interviewed Plaintiff about the report.  *Id.* ¶¶ 90–94.  Out of concern for Jackson and her reputation, and in keeping with Jackson's warnings that Plaintiff not tell anyone, Plaintiff initially denied abuse by Jackson.  *Id.* ¶¶ 66, 95.  On that same day, Principal Blakeslee arranged a meeting at which she confronted Plaintiff about her denial of the abuse in the presence of other students (those who reported the abuse and another uninvolved student); also on that same day, when Plaintiff's father arrived to retrieve her from school, Principal Blakeslee told him in Plaintiff's presence that Plaintiff and Jackson were involved in a "sexual relationship," following which Plaintiff admitted the abuse.  (ECF No. 33 ¶¶ 97–101.)  Plaintiff felt humiliated and betrayed; she was scared and anxious about what might happen to Jackson and how her schoolmates would treat her in the wake of this public disclosure that Jackson had sexually abused her.  *Id.* ¶ 102.

CPS contacted Baltimore Police Department ("BPD") on the day of the report, and BPD launched a criminal investigation. *Id.* ¶ 104. BPD's interviews of Mercy High School faculty and staff made "clear that [faculty and staff] were untrained and therefore uneducated in preventing, recognizing, and reporting child sexual abuse," despite "such training [being] a mandatory requirement that must be renewed annually under the Archdiocese's Policy." *Id.* ¶¶ 105–11. Moreover, when announcing Jackson's criminal arrest and charge to parents, President Lennon "intentionally misrepresented to parents that Mercy High School's hiring process complies with all applicable laws and that all candidates for employment 'undergo a fingerprint criminal background check through the FBI's Criminal Justice Identification Services (CJIS) Division' that is updated automatically to apprise the school if employees are subsequently charged with crimes." *Id.* ¶¶ 114–16. President Lennon's statements were dishonest and a violation of Mercy High School's duties (fiduciary and otherwise) to protect its students. *Id.* ¶ 116.

Following the report of her abuse, Plaintiff did not attend school for two weeks, and Mercy High School did not attempt to "devise a plan of action to ensure that she felt safe and secure to return to classes." *Id.* ¶¶ 119–21. Upon her return to school, Plaintiff felt betrayed by her friends, bullied and harassed. In reaction to being bullied and harassed, Plaintiff quit the track team and began to self-harm and abuse drugs and alcohol. (ECF No. 33 ¶¶ 124–27.) Principal Blakeslee subsequently suspended Plaintiff on two occasions based on unfounded reports of substance abuse – reports Plaintiff denied and that came from students Plaintiff alleges disliked her because of her abuse claims.[3] *Id.* ¶¶ 129–30.

Defendants' failure to fulfill their duties to Plaintiff caused her "four years of trauma, first from the abuse and then from the Defendants' response and retaliation, causing [her] emotional

---

[3] "Jackson was in his late 20's and students thought he was good-looking and 'really cool.'" (ECF No. 33 ¶ 56.)

and psychological injuries that have and will negatively impact her for life." *Id.* ¶ 150.

**E.  Subsequent Criminal Prosecution of Jackson**

In connection with his sex abuse of Plaintiff, on November 22, 2018, Jackson was arrested and charged with "Sex Abuse of a Minor, Sexual Solicitation of a Minor, Sex Offense – Fourth Degree by a Person in Position of Authority, and Sex Offense Third Degree Sex Offense, involving Victim Jane Doe from August 2015 to November 2018." *Id.* ¶ 137.  "Two months before Jackson's criminal trial for sexually abusing Jane Doe, he was arrested for sex offense in the third degree," for his sexual abuse of the minor (not Plaintiff) in August 2015. *Id.* ¶ 143.  Jackson pled guilty to the August 2015 sex offense and received prison time. *Id.* ¶ 143.  In connection with his abuse of Plaintiff, on December 16, 2019, Jackson pled guilty to "sex offense in the fourth degree by a person in a position of authority and second degree assault." *Id.* ¶ 144.

**F.  Procedural History**

Plaintiff filed suit in the Circuit Court for Baltimore City on or around April 10, 2023. (ECF No. 1-2 at p. 47.)  On May 4, 2023, Defendants Mercy High School, BOT, MHSAM (collectively, "Mercy High School Defendants"), with the consent of Defendants SOM, SOM South Central, and MESA (collectively, "SOM and MESA Defendants"), removed the action to this court.  (ECF Nos. 1, 1-1.)  All Defendants moved to dismiss the complaint.  (ECF Nos. 15, 16.)  Plaintiff then sought leave to amend the complaint, which this court granted.  (ECF Nos. 19, 32.)  On August 22, 2023, the Amended Complaint was docketed and is now the operative complaint.  (ECF No. 33; the "Amended Complaint").

In the Amended Complaint, Plaintiff asserts the following claims:

> **Count I**: Negligent Hiring against Defendants Mercy High School, BOT, SOM, SOM South Central, and MESA;

> **Count II**: Negligent Supervision, Retention, and Training against

Defendants Mercy High School, BOT, SOM, SOM South Central, and MESA;

**Count III**: Gross Negligence against Defendants Mercy High School and BOT;

**Count IV**: Breach of Fiduciary Duty against Defendants Mercy High School, BOT, SOM, SOM South Central, and MESA;

**Count V**: Violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.* against Defendants Mercy High School and BOT;

**Count VI**: Retaliation in Violation of Title IX against Defendant Mercy High School;

**Count VII**: Fraudulent Conveyance against Defendants Mercy High School, BOT, and MHSAM; and

**Count VIII**: Negligence against Defendants Mercy High School, BOT, SOM, SOM South Central, and MESA.

(ECF No. 33.)  In response to the Amended Complaint, Defendants filed the instant motions to dismiss.  (ECF Nos. 34, 35.)

## II.    PLAINTIFF'S USE OF A PSEUDONYM

In her Amended Complaint, Plaintiff states that she brings this action "anonymously" due to the nature of the sexual abuse allegations.  (ECF No. 33 at p. 2 n.1.)  Under Federal Rule of Civil Procedure 10(a), a complaint must include a title naming all parties.  FED. R. CIV. P. 10(a). In exceptional circumstances, however, the court may allow a party to proceed pseudonymously. *Doe v. Pub. Citizen*, 749 F.3d 246, 273–74 (4th Cir. 2014).  Before granting a request to proceed pseudonymously, the "district court has an independent obligation to ensure that extraordinary circumstances support such a request by balancing the party's stated interest in anonymity against the public's interest in openness and any prejudice that anonymity would pose to the opposing party."  *Id.* at 274.  The Fourth Circuit provides five non-exhaustive factors that courts should

10

consider to determine whether to grant a request to proceed pseudonymously:

> [W]hether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; the ages of the persons whose privacy interests are sought to be protected; whether the action is against a governmental or private party; and, relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). "Not all of these factors may be relevant to a given case, and there may be others that are." *Doe v. Alger*, 317 F.R.D. 37, 39 (W.D. Va. 2016).

Plaintiff has not filed a motion for leave of court to proceed by pseudonym but notes her intention to proceed by pseudonym in her Amended Complaint, and Defendants have voiced no objection to Plaintiff's use of a pseudonym. (ECF No. 33 at p. 2 n.1.) In the interests of justice and judicial efficiency, the court will therefore *sua sponte* consider whether Plaintiff is permitted to proceed pseudonymously as though she filed a proper motion. *See Doe v. Univ. of Maryland Med. Sys. Corp.*, No. CV SAG-23-1572, 2023 WL 3949737, at *4 (D. Md. June 12, 2023) (considering *sua sponte* whether a party may proceed pseudonymously where, among other things, the allegations concerned allegations that were of an "intensely sensitive nature"). The court therefore evaluates this action in accordance with the *Jacobson* factors.

With respect to the first factor, Plaintiff's use of a pseudonym must be for the purpose of preserving "privacy in a matter of sensitive and highly personal nature" and not "merely to avoid the annoyance and criticism that may attend any litigation." *Jacobson*, 6 F.3d at 238. Courts in this circuit (and others) have found that allegations of sexual assault are of a "sensitive and highly personal nature," and thus satisfy this factor. *See, e.g.*, *Doe v. Anne Arundel Cnty.*, No. 1:23-CV-03451-JRR, 2024 WL 2053719, at *2 (D. Md. May 8, 2024) (permitting a plaintiff to proceed by

11

pseudonym where she alleged she was subject to sexual harassment, abuse, and assault); *E.E.O.C. v. Spoa, LLC*, No. CIV. CCB-13-1615, 2013 WL 5634337, at *3 (D. Md. Oct. 15, 2013) (permitting the intervening plaintiff to remain anonymous where she sought to "preserve her privacy in a highly sensitive and personal matter involving sexual assault"); *Doe v. Williams*, No. CV 1:23-5745-JDA-SVH, 2024 WL 1120175, at *1 (D.S.C. Mar. 14, 2024) ("It is well-recognized in this circuit that victims asserting allegations of sexual misconduct constitute matters 'of a highly sensitive and personal nature.'"); *E.E.O.C. v. Wal-Mart Stores E., L.P.*, No. 5:23-CV-00623, 2024 WL 349760, at *1 (S.D.W. Va. Jan. 30, 2024) (allowing plaintiff to proceed by pseudonym where the complaint alleged sexual assault and was a "highly sensitive and personal subject[]"); *Alger*, 317 F.R.D. at 40 (finding that the first factor weighs in favor of anonymity where the plaintiff made allegations involving sexual misconduct); *Doe v. Skyline Automobiles Inc.*, 375 F. Supp. 3d 401, 405–406 (S.D.N.Y. 2019) (noting that allegations involving sexual assault, sexual harassment, and related ridicule "are highly sensitive and of extremely personal nature to the Plaintiff"). As Plaintiff's allegations here concern sexual abuse by a school employee while she was a minor, as well as the harassment she experienced following the abuse being made public, the first *Jacobson* factor weighs heavily in favor of Plaintiff's use of a pseudonym.

The second factor considers whether requiring Plaintiff to be named "poses a risk of retaliatory physical or mental harm." *Jacobson*, 6 F.3d at 238. While reputation risks alone may not be "sufficient to outweigh the public interest in the openness of this litigation," *Candidate No. 452207 v. CFA Inst.*, 42 F. Supp. 3d 804, 809 (E.D. Va. 2012), "[t]he experience of sexual abuse can be deeply psychologically traumatic, and public knowledge of such abuse can trigger new trauma even years after the fact." *John Doe 140 v. Archdiocese of Portland in Oregon*, 249 F.R.D. 358, 361 (D. Or. 2008). There is a risk of retaliatory or mental harm where a plaintiff "may face

psychological harm from having [her] sensitive experience made permanently available to anyone with Internet access." *Spoa, LLC*, 2013 WL 5634337, at \*3. Where "there could be some risk of mental harm to plaintiff upon public dissemination of her identity in connection with" sensitive personal information, anonymity may be warranted. *Doe v. Chesapeake Med. Sols., LLC*, No. CV SAG-19-2670, 2020 WL 13612472, at \*2 (D. Md. Feb. 26, 2020).

The court is persuaded that, were the court to require Plaintiff to name herself, she would be vulnerable to significant physical or mental harm as a result of having her highly sensitive information be made public. *See Spoa, LLC*, 2013 WL 5634337, at \*3, *supra*. *See Wal-Mart Stores E., L.P.*, 2024 WL 349760, at \*2 ("Sexual violence is a profoundly negative and traumatic life event with widespread psychological and sociological effects on the victim. Disclosing Ms. Doe's name on the public docket, which is likely to remain permanently available on the Internet, presents a significant risk of subjecting Ms. Doe to future psychological trauma."); *Alger*, 317 F.R.D. at 40 (allowing the plaintiff to use a pseudonym in a case involving sexual assault allegations because the use of real identities "would likely increase their risk of retaliatory physical or mental harm"). This is particularly relevant here, where Plaintiff alleges that she engaged in self-harm and substance abuse to cope with the aftermath of the abuse and its publication (including what she views as bullying and harassment by students, and general mis-management of the report by Defendants). Therefore, the second factor further weighs in favor of allowing Plaintiff to proceed by pseudonym.

The third factor (Plaintiff's age) weighs against allowing Plaintiff to proceed by pseudonym, as she is not a minor. *See Jacobson*, 6 F.3d at 238; *Smith v. Towson Univ.*, No. CV JRR-22-2998, 2022 WL 18142844, at \*2 (D. Md. Nov. 30, 2022), *aff'd,* No. 22-2319, 2023 WL 3053034 (4th Cir. Apr. 24, 2023) (finding that the third factor weighed against permitting the

plaintiff to proceed by pseudonym where he was an adult).  The fourth factor (whether the action is against a governmental entity or private party) is not in Plaintiff's favor, as Defendants are private, not government, parties; however, the court concludes this factor has a neutral impact, as no Defendant has objected to Plaintiff proceeding by pseudonym.  (ECF No. 33 ¶¶ 8–14.)  *See Jacobson*, 6 F.3d at 238; *Doe v. Merten*, 219 F.R.D. 387, 394 (E.D. Va. 2004) ("[C]ourts in general are less likely to grant a plaintiff permission to proceed anonymously when the plaintiff sues a private individual than when the action is against a governmental entity seeking to have a law or regulation declared invalid.").

With respect to the fifth *Jacobson* factor, the court examines whether there is a "risk of unfairness to the opposing party from allowing an action against it to proceed anonymously."  6 F.3d at 238.  The court again notes that no Defendant has voiced an objection or contends any unfairness will result by allowing Plaintiff to proceed by pseudonym.  Further, Defendants know who Plaintiff is and are "fully capable of investigating and responding to her allegation."  *Spoa, LLC*, 2013 WL 5634337, at *3.  Therefore, there is no risk that allowing Plaintiff to proceed by pseudonym will prejudice their defense.  *Id.  See Alger*, 317 F.R.D. at 41 (finding that the fifth factor weighs in favor of anonymity where the defendants are fully aware of the plaintiff's identity and fail to articulate how they would be prejudiced in their defense).  Therefore, the fifth factor weighs in favor of granting permitting Plaintiff to proceed by pseudonym.

Upon consideration of the *Jacobson* factors and the circumstances of the instant case, the court concludes that the present case implicates Plaintiff's privacy interests pertaining to a highly sensitive and stigmatizing matter, and "substantially outweigh the presumption of open judicial proceedings."  *See Pub. Citizen*, 749 F.3d at 274, *supra*.  Accordingly, the court will allow Plaintiff to proceed under the pseudonym "Jane Doe," and direct that any document that identifies Plaintiff

by name, in whole or in part, shall be filed under seal, with redacted copies to be placed in the public file.

## III.   LEGAL STANDARDS

### A.   Federal Rule of Civil Procedure 12(b)(2)

SOM and MESA Defendants seek dismissal of Plaintiff's claims against SOM South Central for lack of personal jurisdiction pursuant to Rule 12(b)(2).  "[A] Rule 12(b)(2) challenge raises an issue for the court to resolve, generally as a preliminary matter."  *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016) (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). "Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge."  *Id.*  "[A] court has broad discretion to determine the procedure that it will follow in resolving a Rule 12(b)(2) motion."  *Id.* at 268.  "[N]either discovery nor an evidentiary hearing is required in order for the court to resolve a motion under Rule 12(b)(2)."  *Jones v. Mutal of Omaha Ins. Co.*, 639 F. Supp. 3d 537, 544 (D. Md. 2022).  "When 'the existence of jurisdiction turns on disputed factual questions the court may resolve the [jurisdictional] challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question.'"  *Id.* (quoting *Combs*, 886 F.2d at 676).

"When personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a *prima facie* case of jurisdiction."  *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019).  "This '*prima facie* case' analysis resembles the plausibility inquiry governing motions to dismiss for failure to state a claim under Rule 12(b)(6)."  *Id.*  Thus, the court takes "the allegations and available evidence relating to personal jurisdiction in the light most favorable to the plaintiff."

*Grayson*, 816 F.3d at 268.  Still, a plaintiff must ultimately "prove the existence of a ground for jurisdiction by a preponderance of the evidence."  *Combs*, 886 F.2d at 676.  Notably, unlike the rubric of Rule 12(b)(6), in resolving a 12(b)(2) motion, "a court may look beyond the complaint to affidavits and exhibits in order to assure itself of personal jurisdiction." *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350 (4th Cir. 2020) (citing *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016)).  Accordingly, the court may consider the exhibits SOM and MESA Defendants offer in support of their Rule 12(b)(2) argument.  (ECF No. 34-1 at p. 11–13.)

### B.  Federal Rule of Civil Procedure 12(b)(6)

All Defendants seek dismissal pursuant to Rule 12(b)(6).  A motion asserted under Rule 12(b)(6) "test[s] the sufficiency of a complaint;" it does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  Therefore, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244.

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnote omitted).  "[A] complaint that provides no more than 'labels and conclusions,' or 'a formulaic recitation of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014)

16

(quoting *Twombly*, 550 U.S. at 555). "The [c]ourt must be able to deduce 'more than the mere possibility of misconduct'; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief." *Evans v. 7520 Surratts Rd. Operations, LLC*, No. 8:21-CV-01637-PX, 2021 WL 5326463, at *2 (D. Md. Nov. 16, 2021) (quoting *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015)).

In support of their Rule 12(b)(6) argument, SOM and MESA Defendants attach seven exhibits for the court's consideration: (1) the Declaration of Jack Bartley, Chief Financial Officer for SOM (ECF No. 34-2); (2) the North Carolina Business Entity Registration for SOM South Central (ECF No. 34-3); (3) the Maryland Business Entity Registration for SOM South Central (ECF No. 34-4); (4) the Amended and Restated Bylaws of Mercy High School dated July 1, 2013 (ECF No. 34-5); (5) the Amended and Restated Bylaws of Mercy High School dated August 2, 2017 (ECF No. 34-6); (6) the Declaration of Lisa Marie Griffith, Executive Director of MESA (ECF No. 34-7); and (7) a memorandum opinion of the U.S. District Court for the Western District of Oklahoma in the action *Jane Doe v. Mount St. Mary High School* (ECF No. 34-8).

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court generally does not consider evidence outside of the complaint. However, the court may consider "documents integral to and relied upon in the complaint, . . . so long as the plaintiff does not question their authenticity." *Fairfax v. CBS Corp.*, 2 F.4th 286, 292 (4th Cir. 2021). "An integral document is a document that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)). "In addition to integral and authentic exhibits, on a 12(b)(6) motion the court 'may properly take judicial notice of matters of public record.'" *Id.* (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572

F.3d 176, 180 (4th Cir. 2009)).  Specifically, the court may take judicial notice of publicly available information on state and federal government websites without converting the motion to one for summary judgment.  *See U.S. v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on the state and federal government websites.").

Against this backdrop, the court will take judicial notice of the information in the exhibits at ECF No. 34-3 and 34-4, as they reflect publicly available information on a state website.  *Garcia*, 855 F.3d at 621, *supra*.  Similarly, the court may, of course, consider the opinion at ECF No. 34-8.  Neither Mr. Barley's nor Ms. Griffith's declaration (ECF Nos. 34-2, 34-7), however, nor the Bylaws (ECF Nos. 34-5, 34-6), is "integral to" or "relied upon in the complaint," or falls under another category of items or information the court may consider on a 12(b)(6) motion to dismiss. With respect to the bylaws, SOM and MESA Defendants contend they should be considered because these documents "govern the relationship" between SOM and Mercy High School and are therefore integral to the Amended Complaint.  (ECF No. 41 at p. 6 n.4.)  Putting aside the issue of authenticity,[4] Plaintiff makes no reference to the bylaws in her Amended Complaint, expressly or by implication; she does not rely on them in concept, theory or principle.  (Instead, Plaintiff expressly relies on the Covenant and the Archdiocese's Policy as documents that govern certain aspects of Defendants' relationships to one another and create alleged duties owed to her.)  While bylaws may be relevant to demonstrate the legal relationships (or absence thereof) between and among certain Defendants and Plaintiff, and possibly form defense stepping stones in this way, they do not give rise to the legal rights Plaintiff asserts in this action.  The court will not consider

---

[4]  The court makes no finding on this issue; however, at this stage of litigation, while Plaintiff addresses these documents in her opposition papers as needed to answer the motions, the court notes that Plaintiff may not know of their authenticity or be in a position to challenge or admit same.

them in ruling on SOM and MESA Defendants' Motion; perhaps these documents may bear on this action at a later time. *Fairfax*, 2 F.4th at 292; *Chesapeake Bay Found., Inc.*, 794 F. Supp. 2d. at 611, *supra*.

### C.  Federal Rule of Civil Procedure 12(b)(1)

All Defendants also seek dismissal (at least in part) for lack of subject matter jurisdiction, though none references Rule 12(b)(1).  The court nonetheless proceeds through a Rule 12(b)(1) analysis for completeness.

"Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of subject matter jurisdiction." *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016).  It also governs "motions to dismiss for mootness and for lack of standing, which pertain to subject matter jurisdiction." *Stone v. Trump*, 400 F. Supp. 3d 317, 333 (D. Md. 2019). *See Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016) ("Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of subject matter jurisdiction.").  "The plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction." *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019).  Subject matter jurisdiction challenges may proceed in two ways: a facial challenge or a factual challenge. *Id.*  A facial challenge asserts "that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction." *Id.*  A factual challenge asserts "that the jurisdictional allegations of the complaint [are] not true." *Id.* (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)).  "In a facial challenge, 'the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction.'" *Trump*, 416 F. Supp. 3d at 479 (quoting *Kerns*, 585 F.3d at 192 (instructing that in a facial challenge to subject matter jurisdiction the plaintiff enjoys "the same procedural

protection as . . . under a Rule 12(b)(6) consideration.")).  "[I]n a factual challenge, 'the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction.'"  *Id.*

Defendants present facial, not factual, challenges.  (ECF No. 34-1 at p. 29–31; ECF No. 35-1 at p. 4–10.)  Accordingly, the 12(b)(1)-based challenges will be evaluated in accordance with the procedural protections afforded under Rule 12(b)(6), which is to say that the facts alleged in the Amended Complaint will be taken as true per *Trump* and *Kerns.*

### D.  Federal Rule of Civil Procedure 9(b)

Mercy High School Defendants also seek dismissal of one claim on the basis of Rule 9(b), but fail to reference Rule 9(b) as a basis for their Motion.  The court again includes Rule 9(b) here for completeness.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b); *see Iqbal*, 556 U.S. at 686 ("Rule 9(b) requires particularity when pleading 'fraud or mistake,' while allowing 'malice, intent, knowledge, and other conditions of a person's mind to be alleged generally.'"); *Layani v. Ouazana*, No. CV ELH-20-420, 2021 WL 805405, at *23 (D. Md. Mar. 3, 2021) ("Claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading standard of Rule 9(b).").  "These circumstances are 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir. 1999)).  They are often "referred to as the 'who, what, when, where, and how' of the alleged fraud."  *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (citation omitted).  "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant

has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

## IV.   ANALYSIS

Defendants assert separate arguments for dismissal of claims set forth in Plaintiff's Amended Complaint.  SOM and MESA Defendants seek dismissal of all claims against them on various grounds, arguing that the court does not have personal jurisdiction over SOM South Central; that SOM, SOM South Central, and MESA are separate and distinct legal entities from Mercy High School and are thus shielded from liability; and that Plaintiff has failed to state a claim as to all claims against SOM, SOM South Central, and MESA.  (ECF No. 34-1.)  SOM and MESA Defendants further argue that if the court allows any claim to proceed despite these arguments, they nonetheless must be dismissed from this action by operation of the "ecclesiastical abstention doctrine." *Id.* at p. 29–31.  For their part, Mercy High School Defendants seek partial dismissal of claims against them, arguing that Plaintiff lacks standing as to her fraudulent conveyance claim; Plaintiff otherwise fails to state claims of fraudulent conveyance and breach of fiduciary duty; she is not entitled to punitive damages (even if she prevails); there is no independent claim of gross negligence under Maryland law; and Plaintiff's general negligence claim should be dismissed as duplicative.[5]  (ECF No. 35.)

### A.  Ecclesiastical Abstention Doctrine

At the near close of their motions papers, as an alternative basis for their motion, SOM and MESA Defendants argue that the claims against them must be dismissed by operation of the doctrine of

---

[5] In a footnote, Mercy High School Defendants aver generally that the BOT "lacks capacity to be sued" per Rule 17(b), but do not mount a fulsome argument on this front; nor do they appear to request related Rule 17(b) relief.  (ECF No. 35 at p. 1 n.1.)

ecclesiastical abstention.  (ECF No. 34-1 at p. 29.)  Although SOM and MESA Defendants make this argument in the alternative to their arguments in chief, application of the doctrine would deprive the court of subject matter jurisdiction.  *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 332 (4th Cir. 1997) (affirming the district court's dismissal of a claim for lack of subject matter jurisdiction where it called for "a decision about the nature, extent, administration, and termination of a religious ministry" that fell "within the ecclesiastical sphere that the First Amendment" and was thus protected from "civil court intervention"); *Dixon v. Edwards*, 290 F.3d 699, 714 (4th Cir. 2002) (explaining that a court may "properly exercise jurisdiction" where a civil dispute "can be decided without resolving an ecclesiastical controversy").  Therefore, the court may not reach SOM and MESA Defendants' Rule 12(b)(6) arguments until it resolves their ecclesiastic abstention argument – as were the court to be divested of subject matter jurisdiction, its analysis may not proceed.  Therefore, despite its inclusion as an alternative argument, the court addresses ecclesiastical abstention first.

The Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. CONST. AMEND. I.  "[T]he First Amendment severely circumscribes the role that civil courts may play in resolving" disputes "over church polity and church administration."  *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976) (quoting *Presbyterian Church v. Hull Church*, 393 U.S. 440, 449 (1969)).  Thus, "[i]n keeping with the First Amendment's proscription against the 'establishment of religion' or prohibiting the 'free exercise thereof,' civil courts have long taken care not to intermeddle in internal ecclesiastical disputes."  *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 330 (4th Cir. 1997); s*ee Byrd v. DeVeaux*, No. CV DKC 17-3251, 2019 WL 1017602, at *5

(D. Md. Mar. 4, 2019) (same).   "[W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity."   *Milivojevich*, 426 U.S. at 709; *see Dixon v. Edwards*, 290 F.3d 699, 714 (4th Cir. 2002) ("[C]ivil courts lack any authority to resolve disputes arising under religious law and polity, and they must defer to the highest ecclesiastical tribunal within a hierarchical church applying its religious law." (citing *Milivojevich,* 426 U.S. at 709)). Under Maryland law, such prohibited matters include those that are "theological or doctrinal." *Am. Union of Baptists, Inc. v. Trustees of Particular Primitive Baptist Church at Black Rock, Inc.*, 335 Md. 564, 576 (1994).

"The First Amendment does not remove from the purview of civil courts, however, all controversies involving religious institutions."   *Byrd*, 2019 WL 1017602, at *5 (citing *Jones v. Wolf*, 443 U.S. 595, 602 (1979) (citations omitted)).   Indeed, courts cannot "flatly decline to address a secular dispute" under Maryland law "because it arose against a religious background." *Am. Union of Baptists, Inc.*, 335 Md. at 574.   In *Bell v. Presbyterian Church (U.S.A.)*, *supra,* the Fourth Circuit explained:

> The question that we must resolve in the case before us, therefore, is whether the dispute between Bell and the four national churches is an ecclesiastical one about "discipline, faith, internal organization, or ecclesiastical rule, custom or law," or whether it is a case in which we should hold religious organizations liable in civil courts for "purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization."

*Bell*, 126 F.3d at 331 (citations omitted).   Our sister court in the Eastern District of Virginia concluded that the ecclesiastical abstention doctrine does not apply where the court need not "delve into an extensive inquiry . . . into religious law and policy" and its decision will not "disturb the

decision of the highest ecclesiastical tribunal." *Edley-Worford v. Virginia Conf. of United Methodist Church*, 430 F. Supp. 3d 132, 138 (E.D. Va. 2019) (emphasis omitted).

Nothing about Plaintiff's claims or factual allegations – including allegations describing the organizational and contractual relationships between and among Defendants, and the genesis of their alleged legal duties to Plaintiff – requires the court to inquire into, examine, consider, make findings regarding, or conclusions pertaining to, religious law, religious or theological doctrine, church polity, or church hierarchy.[6]  *See Milivojevich*, 426 U.S. at 709, *supra*.  The fact that the Covenant "concern[s] the mission of the Roman Catholic Church," is neither persuasive nor dispositive here.  (ECF No. 37 at p. 17.)  While the Covenant establishes relationships among SOM and MESA Defendants and Mercy High School Defendants, nothing about that document – or Defendants' shared religion-based mission – has anything whatsoever to do with the matters at hand: hiring, retention, and supervision of a school employee, sex abuse reporting, and related compliance with Maryland civil law.  SOM and MESA Defendants' Motion to dismiss on grounds of ecclesiastical abstention will be denied without prejudice.  The court now turns to SOM and MESA Defendants' other arguments.

---

[6] That SOM and MESA Defendants consented to removal, effectively pleading and invoking this court's subject matter jurisdiction by way of a consented-to notice of removal, and their inclusion of this usually primary argument at page 29 of their motion, in the alternative, suggests SOM and MESA Defendants appropriately evaluate its strength.  And while the court appreciates counsel's fulsome efforts and that subject matter jurisdiction is a critical gateway inquiry, the court cautions that removal of this action to seek dismissal on grounds of subject matter jurisdiction calls into question the propriety of removal in the first instance.  *Mulcahy v. Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994) ("The burden of establishing federal jurisdiction is placed upon the party seeking removal") (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921)); *Parker v. Goldman Sachs Mortg. Co. Ltd. P'ship*, 596 F. Supp. 3d 559, 565 (D. Md. 2022) ("[B]ecause Federal Courts are courts of limited jurisdiction, a district court must remand any case in which it lacks subject matter jurisdiction . . . . Therefore, a party seeking adjudication in federal court must 'demonstrate the federal court's jurisdiction over the matter.'") (citing *In re Blackwater Sec. Consulting, LLC*, 460 F.3d 576, 584 (4th Cir. 2006) and *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008)); *Lambeth v. City of High Point*, No. 1:23-CV-797, 2024 WL 2022693, at *4 (M.D.N.C. May 7, 2024) ("Flip-flopping on the court's jurisdiction in this manner is known as 'fraudulent removal' and has been critiqued because it unnecessarily increases litigation costs and unfairly grants defendants the value of delay.") (citing *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 140 (2005)).  Of course, subject matter jurisdiction is never waived – and the court is under a duty to raise it *sua sponte* when such an issue comes to the fore.

### B. Jurisdiction over SOM South Central

SOM and MESA Defendants contend that SOM South Central must be dismissed for lack of personal jurisdiction because SOM South Central has never "purposefully availed itself of Maryland's jurisdiction or directed any tortious conduct at Maryland." (ECF No. 34-1 at p. 12.) Plaintiff believes that personal jurisdiction over SOM South Central "is likely to exist," because "individuals affiliated with SOM South Central were members of Mercy High School's Board prior to 2017" and Mercy High School is a member of SOM South Central.[7] (ECF No. 37 at p. 19–20.) "The validity of an order of a federal court depends upon that court's having jurisdiction over both the subject matter and the parties." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). Unlike the court's subject matter jurisdiction, "[t]he requirement that the court have personal jurisdiction . . . springs not from Article III of the Constitution, but from the Due Process Clause." *Fidrych v. Marriott Int'l, Inc.,* 952 F.3d 124, 131 (4th Cir. 2019) (citing *Ins. Corp. of Ireland*, 456 U.S. at 702). "Because the personal jurisdiction requirement 'recognizes and protects an individual liberty interest, . . . the requirement may be waived by a defendant's 'express or implied consent to the personal jurisdiction of the court.'" *Id.* (citing *Ins. Corp. of Ireland*, 456 U.S. at 703). "Absent consent, the exercise of personal jurisdiction must comport with the requirements of the Due Process Clause: valid service of process, as well as . . . minimum contacts with the forum so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Hawkins v. i-TV Digitális Távközlési zrt.*, 935 F.3d 211, 228 (4th Cir. 2019)) (citations omitted).

---

[7] Before she filed an Amended Complaint, Plaintiff had agreed to dismiss SOM South Central without prejudice in response to SOM and MESA Defendants' motion to dismiss at ECF No. 21. (*See* ECF No. 34-1 at p. 11 n.3.)

"The nature and quantity of forum-state contacts required depends on whether the case involves the exercise of 'specific' or 'general' jurisdiction." *Id.*  The court may exercise general jurisdiction over a defendant when its contacts with the forum are "so constant and pervasive as to render it essentially at home in the forum State." *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 132 (4th Cir. 2020) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)).  The court may exercise special jurisdiction over a defendant if it has "continuous and systematic contacts with the forum state and the claims at issue arise from those contacts with the forum state." *Id.* (quoting *Daimler AG*, 571 U.S. at 126–27).

Under Rule 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law.  *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997).  In order for the court to assert personal jurisdiction over a non-resident defendant, like SOM South Central (*see* ECF No. 34-3), two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment.  *Christian Sci. Bd. Of Dirs. Of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001) (citing *Stover v. O'Connell Assocs. Inc.,* 84 F.3d 132, 134 (4th Cir. 1994)).

In her opposition to SOM South Central's 12(b)(2) motion, Plaintiff states that she "believes that personal jurisdiction is likely to exist." *Id.* at p. 20.  In the Amended Complaint, Plaintiff avers that this court has personal jurisdiction pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6-102, applying to "a person domiciled in, served with process in, organized under the laws of, or who maintains his principal place of business in the State," which SOM South Central is not.  MD. CODE ANN., CTS. & JUD. PROC. §§ 6-102(a); ECF NO. 33 ¶¶ 6, 13.

"The Maryland long-arm statute . . . limits specific jurisdiction to cases where the cause of action arises from any act enumerated in the statute itself.  Thus, a plaintiff must identify a specific Maryland statutory provision authorizing jurisdiction." *Johns Hopkins Health Sys. Corp. v. Al Reem Gen. Trading & Co.'s Rep. Est.,* 374 F. Supp. 2d. 465, 472 (D. Md. 2005) (citation omitted); *see also Legends Title, LLC v. Cap. One, Nat'l Ass'n,* 659 F. Supp. 3d 637, 644 (D. Md. 2023) ("Maryland's long-arm statute requires Plaintiffs to identify the section of the long-arm statute on which they rely.") (citing MD. CODE ANN., CTS. & JUD. PROC. § 6-103(a)); *Ottenheimer Publishers, Inc. v. Playmore, Inc*., 158 F. Supp. 2d 649, 652 (D. Md. 2001) (noting that "[i]t is nonetheless necessary first to identify a specific Maryland statutory provision authorizing jurisdiction").  This requirement can be met through a complaint or in opposition to a 12(b)(2) motion*. Hausfeld v. Love Funding Corp*., 16 F. Supp. 3d 591, 597 (D. Md. 2014).

Maryland's long-arm statute provides:

> **(b)** A court may exercise personal jurisdiction over a person, who directly or by an agent:
>
> **(1)** Transacts any business or performs any character of work or service in the State;
>
> **(2)** Contracts to supply goods, food, services, or manufactured products in the State;
>
> **(3)** Causes tortious injury in the State by an act or omission in the State;
>
> **(4)** Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;
>
> **(5)** Has an interest in, uses, or possesses real property in the State; or

> **(6)** Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

MD. CODE ANN., CTS. & JUD. PROC. §§ 6-103(a) and (b).

Plaintiff does not identify any provision of the Maryland long-arm statute authorizing this court to exercise specific personal jurisdiction over SOM South Central.  (ECF No. 37 at p. 19–21.)  The court declines to act on behalf of Plaintiff, or in her stead, to opine which, if any, statutory provision supports the exercise of specific personal jurisdiction over SOM South Central.  *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (holding that "[i]n our adversarial system of adjudication, we follow the principle of party presentation"); *see also Greenlaw v. U.S.*, 554 U.S. 237, 243 (2008) (holding that in civil cases, "in the first instance and on appeal . . . , we rely on the parties to frame the issue for decision and assign the court the role of a neutral arbiter of matter the parties present").  Because Plaintiff has failed to meet her burden to demonstrate that the first condition is satisfied, the court need not consider whether the second condition—comportment with the due process—has been met.[8]  Accordingly, the SOM and MESA Defendants' Motion will be granted as to all claims against SOM South Central for lack of personal jurisdiction.

### C. Dismissal for Corporate Separateness

SOM and MESA Defendants further argue that they should be dismissed as parties, with prejudice, because they are separate and distinct legal entitles from Mercy High School that cannot be held liable for the alleged tortious conduct.  (ECF No. 34-1 at p. 8–11.)  Plaintiff contends, however, that the corporate veil argument is not applicable here, where SOM and MESA

---

[8] The court therefore does not address Plaintiff's request for "limited jurisdiction discovery."  (ECF No. 27 at p. 21.)  The dearth of jurisdictional facts alleged as to SOM South Central would contort what is intended to be a restrained form of discovery to resolve a 12(b)(2) conflict into a fishing expedition.

Defendants "are sued for their own conduct that breached the duties they owe to students of their sponsored schools," including Plaintiff. (ECF No. 37 at p. 7.) Plaintiff confirms that she has not sued SOM and MESA Defendants "under theories of *respondeat superior* or vicarious liability." (ECF No. 37 at p. 7.)

While it is true that generally "a parent corporation . . . is not liable for the acts of its subsidiaries," *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted), Plaintiff asserts her claims against SOM and MESA Defendants based on "their own conduct that breached the duties they owe to students of their sponsored school. (ECF No. 37 at p. 7.) The court finds SOM and MESA Defendants' argument premature at this stage of the litigation. In her Amended Complaint, Plaintiff alleges that "[a]t all relevant times, [SOM] has sponsored Mercy High School." (ECF No. 33 ¶¶ 17–19.) The Covenant grants MESA "reserved governance powers and control over [Mercy High School's] board," and SOM and MESA Defendants are "contractually responsible for the policies and programs of Mercy High School and ensuring its policy to prevent violence and abuse against its students is comprehensive, implemented, and effective to recognize, prevent and report sexual abuse." *Id.* ¶¶ 22, 26. Plaintiff also contends that MESA is "responsible to ensure that the [BOT] fulfills its fiduciary duties to set the direction of the school and establish its policies and programs to provide students and the school's community with a Mercy Education." *Id.* ¶ 23 Accepting the allegations as true and drawing all reasonable inferences in Plaintiff's favor, the court concludes that SOM and MESA are proper parties. The court will, however, still consider whether Plaintiff has alleged sufficient facts to state a claim against SOM and MESA under each applicable count. *See infra.*

**D.  Fraudulent Conveyance Claims against Mercy High School Defendants**

The Maryland Uniform Fraudulent Conveyance Act ("MUFCA") "prohibits fraudulent conveyances of assets to avoid liability." *Van Croft v. Louis*, No. PX-21-3084, 2023 WL 4421571, at *3 (D. Md. July 10, 2023) (citing *Meese v. Meese*, 212 Md. App. 359, 369 (2013)).   A conveyance includes "every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or incumbrance."  MD. CODE ANN., COM. LAW § 15-201(c).  A creditor is "a person who has any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." *Id.*  § 15-201(d).  "To maintain a suit pursuant to MUFCA, the plaintiff needs to allege that a creditor-debtor relationship exists and that the debtor has fraudulently transferred assets." *Dixon v. Bennett*, 72 Md. App. 620, 623 n.2 (1987), *overruled on other grounds by BAA, PLC v. Acacia Mut. Life Ins. Co.*, 400 Md. 136 (2007) (citing MD. CODE ANN., COM. LAW § 15–201).

Plaintiff brings her fraudulent conveyance claims under sections 15-204 and 15-205 of the MUFCA.  Section 15-204 provides: "Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration." MD. CODE ANN., COM. LAW § 15-204.  Section 15-205 provides: "Every conveyance made without fair consideration when the person who makes it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and other persons who become creditors during the continuance of the business or transaction without regard to his actual intent." *Id.*  § 15-205. Against the backdrop of Rules 9(b) and 12(b)(6), "[a] plaintiff sufficiently pleads a fraudulent conveyance claim under the MUFCA by describing the transactions which allegedly constitute a

fraudulent conveyance, identifying the participants in those transactions, and generally alleging that the transfers were made without fair consideration." *Santander Bank, NA v. Gaver*, No. CV RDB-17-00374, 2019 WL 1077386, at *5 (D. Md. Mar. 7, 2019) (citing cases). As explained *supra*, intent "may be alleged generally." FED. R. CIV. P. 9(b).

### 1.  *Plaintiff's Standing as to the 2008 Real Property Transaction*

Mercy High School Defendants' first argue that, with respect to the 2008 Real Property Transaction, Plaintiff lacks standing to assert her MUFCA claim because she has not alleged a "debtor-creditor relationship" at the time of the transaction, meaning she was not "personally and specifically affected by the Defendants' conduct in a way different from the public generally." (ECF No. 35 at p. 5 (citations omitted).) Plaintiff contends that if MHSAM was conveyed the real property at issue as part of a fraudulent scheme, limitations were tolled in accordance with MD. CODE ANN., CTS. & JUD. PROC. § 5-203. (ECF No. 38 at p. 5.) *See* MD. CODE ANN., CTS. & JUD. PROC. § 5-203 ("If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.").

Article III of the United States Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *Id.* Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff bears the burden of establishing these three elements. *Id.* Because the instant case is at the pleading stage, Plaintiff may rely on general

factual allegations of injury resulting from a Defendant's conduct. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice."). The first element, injury-in-fact, requires "a plaintiff [to] show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).

Relevant here, Maryland courts have held that a claim under section 15-204 of the MUFCA requires: "(1) a conveyance, (2) the debtor either already is insolvent, or will be made insolvent by this conveyance; (3) the existence of a debtor-creditor relationship; and (4) lack of fair consideration." *Brooke Grove Found., Inc. v. Bradford*, No. PWG-17-3364, 2018 WL 6417082, at *3 (D. Md. Dec. 4, 2018) (citations omitted); *see Greystone Operations, LLC v. Steinberg*, No. 454, Sept. term, 2016, 2017 WL 1365365, at *3 (Md. Ct. Spec. App. Apr. 12, 2017) ("[T]he elements of a fraudulent conveyance under [Section 15-204] are: 1) a conveyance; 2) the debtor either already is insolvent, or will be made insolvent by this conveyance; 3) the existence of a debtor-creditor relationship; and 4) lack of fair consideration."). "[A] claimant must allege a debtor-creditor relationship at the time the alleged conveyances occurred in order to state a claim under § 15-204." *N. Ave. Cap., LLC v. United States*, No. CV SAG-22-03240, 2023 WL 2864939, at *5 (D. Md. Apr. 10, 2023) (citing cases).

Section 15-204 is expressly confined "to creditors," as opposed to section 15-205's more expansive language encompassing "creditors *and other persons who become creditors during the continuance of the business or transaction.*" *N. Ave. Cap., LLC v. United States*, No. CV SAG-22-03240, 2023 WL 2864939, at *5 (D. Md. Apr. 10, 2023). Judge Gallagher's opinion in *North Avenue Capital LLC* is instructive:

> Legalist nonetheless argues that the language of § 15-204 does not
> exclude future creditors from asserting a claim under that provision.
> Specifically, the provision states a conveyance is fraudulent "as to
> creditors" if it is incurred by a person who is or will be rendered
> insolvent by the transactions, and where the conveyance is made
> without fair consideration. MD. CODE ANN., COMM. LAW § 15-204.
> But statutes must be construed "as a whole so that no word, clause,
> sentence, or phrase is rendered surplusage, superfluous,
> meaningless, or nugatory." *Moore v. State*, 388 Md. 446, 453
> (2005). Notably, § 15-205, which applies to instances when a
> conveyance leaves a party with "an unreasonably small capital,"
> states that such a transaction is fraudulent "as to creditors *and other*
> *persons who become creditors during the continuance of the*
> *business or transaction*." § 15-205 (emphasis added). Similarly, §
> 15-206, which applies to conveyances made by parties who believe
> they will incur debts beyond their ability to pay as they mature,
> renders such conveyances fraudulent "as to both present *and future*
> *creditors*." § 15-206 (emphasis added). If the phrase "as to
> creditors" in § 15-204 encompassed future creditors, then portions
> of §§ 15-205 and 15-206 would be surplusage. Thus, reading the
> statutory scheme "as a whole," *Moore*, 388 Md. at 453, it is clear
> that "as to creditors" in § 15-204 refers only to creditors in existence
> at the time of the challenged conveyance.

*Id.* Thus, section 15-204 cannot be read to include future creditors.

With respect to the 2008 Real Property Transaction, the court is persuaded by Mercy High School Defendants that Plaintiff has not pled facts that, if true, establish that she was a creditor at the time of the 2008 conveyance.  Judge Gallagher's reasoning applies here.  To construe section 15-204 to include future creditors expands its limited express language and would render the language of other provisions of the statute surplusage.   Because Plaintiff was not a creditor at the time of the 2008 Real Property Transaction, as is required by section 15-204, the tolling she argues for is inapplicable.   Accordingly, with respect to the 2008 Real Property Transaction for the alleged section 15-204 violation, Plaintiff's claim fails because she cannot show that she "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or

imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).

### 2. *The 2008 Real Property Transaction and the 2022 Real Property Transaction*

As Plaintiff alleges her creditor status as to the 2022 transactions, and claims brought under section 15-205 extend protection to "persons who become creditors during the continuance of the business or transaction," Mercy High School Defendants' standing argument is inapplicable to same. The court, however, agrees with Mercy High School Defendants that Plaintiff has failed to state a claim of fraudulent conveyance where the conveyances at issue involved non-party to party conveyances. (ECF No. 35 at p. 8.) Both the 2008 Real Property Transaction and the 2022 Real Property Transaction fit this description, which is to say neither transaction flowed from a party attempting to protect assets in the event of liability.[9] *See Van Croft*, 2023 WL 4421571, at *3, *supra*. Similarly, both transactions involved conveyance to MHSAM, a party to this action; so no section 15-204 argument can be had that MHSAM was made insolvent by these transactions. (ECF No. 33 ¶¶ 225, 230.)

Similarly, allegation that real property was conveyed to MHSAM for the purchase price of $140,000 is not, on the face of the pleading, a conveyance for "unreasonably small capital." MD. CODE ANN., COM. LAW § 15-205. To the extent Plaintiff intended to assert that MHSAM conveyed the real property to Mercy High School and its BOT in 2022, she does not argue this or refer the court to pleading allegations that might reasonably support such a conclusion. (ECF No. 33 ¶ 230.)

---

[9] Plaintiff's Amended Complaint states that Sisters of Mercy of Baltimore, Inc. (the conveyor of the 2008 Real Property Transaction) merged into SOM South Central in 2008. (ECF No. 33 at p. 45 n.12.) Beyond the court already having concluded that Plaintiff has not met her personal jurisdiction burden as to SOM South Central, she has not pled, alleged, or argued any successor liability and, notably, her fraudulent conveyance claim was not brought against SOM South Central. (ECF No. 33 at p. 44.)

Accordingly, the court will dismiss Plaintiff's fraudulent conveyance claim to the extent it relies upon the 2008 Real Property Transaction and/or the 2022 Real Property Transaction.

### 3. *2022 Tower Lease Transaction*

The issues that beset the claims pertaining to the 2008 Real Property Transaction and 2022 Real Property Transaction are not present with respect to the 2022 Tower Lease Transaction.  In 2022, Plaintiff had a claim, "whether matured or unmatured," against Mercy High School Defendants.  MD. CODE ANN., COM. LAW § 15-201(d).  Regarding the 2022 Tower Lease Transaction, Defendant argues that Plaintiff has not alleged facts to show that Mercy High School was rendered insolvent, as required by section 15-204, or that the transaction was made without fair consideration, as required by sections 15-204 and 15-205.  (ECF No. 40 at p. 2–3.)

A "person is insolvent if the present fair market value of his assets is less than the amount required to pay his probable liability on his existing debts as they become absolute and matured." MD. CODE ANN., COM. LAW § 15-202; *Brooke Grove Found., Inc. v. Bradford*, No. 8:17-CV-03364-PWG, 2018 WL 6417082, at *3 (D. Md. Dec. 4, 2018); *Cross River Bank v. 3 Bea's Assisted Living LLC*, No. TJS-21-3210, 2023 WL 6161414, at *6 (D. Md. Sept. 21, 2023), *reconsideration denied,* No. TJS-21-3210, 2023 WL 7324237 (D. Md. Nov. 7, 2023).

The MUFCA provides:

> Fair consideration is given for property or an obligation, if:
>
> (1) In exchange for the property or obligation, as a fair equivalent for it and in good faith, property is conveyed or an antecedent debt is satisfied; or
> (2) The property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared to the value of the property or obligation obtained.

MD. CODE ANN., COM. LAW § 15-203.

Plaintiff has alleged the parties to, date, and nature of the 2022 Tower Lease Transaction, that Mercy High School conveyed its interest in a "lucrative" Tower Lease Agreement to MHSAM for zero consideration, and that the transaction left Mercy High School and/or the BOT "insolvent and/or grossly undercapitalized." (ECF No. 33 ¶¶ 231–35.) Plaintiff has pled sufficient facts to state a claim for fraudulent conveyance as to the 2022 Tower Lease Transaction. *See Santander Bank, NA v. Gaver*, No. CV RDB-17-00374, 2019 WL 1077386, at *5 (D. Md. Mar. 7, 2019) ("A plaintiff sufficiently pleads a fraudulent conveyance claim under the MUFCA by describing the transactions which allegedly constitute a fraudulent conveyance, identifying the participants in those transactions, and generally alleging that the transfers were made without fair consideration.") (citing cases); *U.S. ex rel. Wilson*, 525 F.3d at 379, *supra.* Further, with respect to section 15-204, Plaintiff must also allege that "the debtor either already is insolvent, or will be made insolvent by this conveyance." *Brooke Grove Found., Inc.*, 2018 WL 6417082, at *3. Having done so, Plaintiff has successfully stated a claim.

Mercy High School Defendants' comparison to *North Avenue Capital* is not compelling. In that case, the court concluded that the plaintiff's "generalized and speculative pleadings" were insufficient to adequately plead her MUFCA claims. 2023 WL 2864939, at *5. It noted that, unlike in *Santander Bank*, the plaintiff in *North Avenue Capital* did not identify the purportedly fraudulent transfers, the amount of money involved in those transfers, or which entities were involved in the transfers. *Id.* Such deficiencies are not found here.

Here, like in *Santander Bank*, Plaintiff identifies the exact date and nature of the 2022 Tower Lease Transaction, she describes the lease interest as "lucrative," and identifies the parties to the transaction. (ECF No. 33 ¶¶ 232–35.) She also "generally alleges" that those "transfers were made without fair consideration" and that Mercy High School was made insolvent by the

transaction.  *See Santander Bank*, 2019 WL 1077386, at *5, *supra*.  The court finds that such allegations are sufficient at this stage to satisfy her pleading requirements.[10]

To summarize, Plaintiff asserts three allegedly fraudulent conveyances in violation of the MUFCA (at sections 15-204 and 15-205): (1) the 2008 Real Property Transaction; (2) the 2022 Real Property Transaction; (3) and the 2022 Tower Lease Transaction.  The court finds: (1) Plaintiff lacks standing as to her claim under section 15-204 for the 2008 Real Property Transaction, so the claim will be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1); (2) Plaintiff fails to state a claim per Rule 12(b)(6) for fraudulent conveyance as to the 2008 Real Property Transaction and the 2022 Real Property Transaction under either provision of the MUFCA; (3) Plaintiff successfully states a claim for fraudulent conveyance based on the 2022 Tower Lease Transaction under sections 15-204 and 15-205, and it is on this basis that her fraudulent conveyance claim may proceed.

### E.  Negligence Claims

"A plaintiff bringing a negligence claim must establish four elements: 'a duty owed to him (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages.'"  *Kiriakos v. Phillips*, 448 Md. 440, 456 (2016) (quoting *Jacques v. First Nat'l Bank of Md.,* 307 Md. 527, 531 (1986)).

### 1.  Duty

"Because '[t]here can be no negligence where there is no duty that is due[,]' an analysis as to negligence usually begins 'with the question of whether a legally cognizable duty exi[s]ts.'"

---

[10]   To require that a plaintiff plead, pre-discovery, the depth of facts Defendants demand regarding a party's assets and liabilities is unreasonable; and the controlling case law does not require it.  Most plaintiffs bringing a civil claim for fraudulent conveyance will not have the benefit, as the plaintiff in *Santander Bank* did, of an underlying criminal proceeding regarding the transaction or more extensive details about a defendant's operation.

*Kennedy Krieger Inst., Inc. v. Partlow*, 460 Md. 607, 633 (2018) (*Doe v. Pharmacia & Upjohn Co.*, 388 Md. 407, 414 (2005)).  A duty is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Pharmacia & Upjohn Co.*, 388 Md. at 415 (quoting *Dehn v. Edgecombe*, 384 Md. 606, 619 (2005)).  "[T]he determination of whether a duty exists represents a policy question of whether the plaintiff is entitled to protection from the defendant." *Id.*  The "classic factors" that the court uses "to decide questions of duty under the common law" are:

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost[,] and prevalence of insurance for the risk involved.

*Kiriakos*, 448 Md. at 486 (quoting *Ashburn v. Anne Arundel Cnty.*, 306 Md. 617, 627 (1986)).  "Importantly, '[i]n cases involving personal injury, the principal determinant of duty becomes foreseeability.'" *Kennedy Krieger Inst., Inc.*, 460 Md. at 634 (quoting *Pharmacia & Upjohn Co.*, 388 Md. at 416); *see Jacques*, 307 Md. at 534–35 ("In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. . . . [W]here the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability." (citation omitted)).  However, foreseeability "alone does not justify the imposition of a duty." *Kiriakos*, 448 Md. at 486.  Courts should "resist[] the establishment of duties of care to indeterminate classes of people." *Pharmacia & Upjohn Co.*, 388 Md. at 420.

Relevant here, "it is undisputed that a school has a duty 'to exercise reasonable care to protect a pupil from harm.'" *Gambrill v. Bd. of Educ. of Dorchester Cnty.*, 481 Md. 274, 314–15 (2022) (quoting *Lunsford v. Bd. of Ed. of Prince George's County*, 280 Md. 665, 676 (1977)); *see Eisel v. Bd. of Educ. of Montgomery County*, 324 Md. 376, 384 (1991) ("[A] school is under a special duty to exercise reasonable care to protect a pupil from harm." (quoting *Segerman v. Jones*, 256 Md. 109, 123–24 (1969)).

Similarly at issue, "[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort." *Blondell v. Littlepage*, 413 Md. 96, 120–21 (2010) (quoting *Jacques*, 307 Md. at 533–35); *see Wilmington Trust Co. v. Clark*, 289 Md. 313, 328–329 (1981) ("While a tort action in favor of a contracting party can be founded upon a duty arising out of the contractual relationship, . . . the duty giving rise to the tort cause of action must be independent of the contractual obligation . . . . Mere failure to perform a contractual duty, without more, is not an actionable tort."). Still, "[w]here a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such duty is a tort and the injured party may have his remedy by an action on the case." *Jacques*, 307 Md. at 534 (citation omitted). "[T]he duty giving rise to a tort action must have some independent basis." *Mesmer v. Maryland Auto. Ins. Fund*, 353 Md. 241, 253 (1999). While "[t]here is no single principle or simple test for determining when a defendant's breach of a contract will also breach an independent duty and give rise to a tort action," where a defendant has "proceeded on the basis that a contractual obligation exists, has undertaken that obligation, and has undertaken it in violation of the appropriate standard of care, . . . the plaintiff may, in some circumstances, maintain a tort action." *Id.* at 254. A negligence claim may arise

from a party's failure to perform a duty which would not have existed "but for" the contractual

relationship, even if both are not parties to the contract. *Addi v. Corvias Mgmt.-Army, LLC*, No.

CV ELH-19-3253, 2020 WL 5076170, at *26 (D. Md. Aug. 27, 2020) (quoting *New Summit*

*Associates, Ltd. P'Ship v. Nistle*, 73 Md. App. 351, 366 (1987) (citations omitted)).

SOM and MESA Defendants argue that Plaintiff fails to allege a "legally cognizable" tort

duty owed to Plaintiff.  (ECF No. 34-1 at p. 15–17.)  Specifically, they argue there is no special

duty to protect another from criminal acts by a third party in the absence of statute or a special

relationship, and the relationship between them (school sponsors) and Plaintiff (a school student)

is not one attended by "foreseeability of the harm." (ECF No. 24-1 at p. 15–16 (citations omitted).)

In turn, Plaintiff contends that her Amended Complaint pleads "sufficient facts to allege that [SOM

and MESA Defendants'] contractual obligations under the Covenant . . . created an independent

special duty of care." (ECF No. 37 at p. 11.)

Accepting Plaintiff's allegations as true, MESA, on behalf of SOM, must ensure Mercy

High School and the BOT "fulfill[] [their] fiduciary duties to . . . establish its policies and programs

to provide students and the school's community with a Mercy Education." (ECF No. 33 ¶ 23.)

SOM and MESA Defendants are "contractually responsible for the policies and programs of Mercy

High School," including "ensuring its policy to prevent violence and abuse against its students is

comprehensive, implemented, and effective to recognized, prevent[,] and report sexual abuse." *Id.*

¶ 26.  SOM and MESA Defendants "sanction[ed] Mercy High School's adoption of the

Archdiocese's Policy, but they had a "duty to students . . . to write and implement a child abuse

protection policy" that was effective for Mercy High School and that clearly educated faculty and

staff. *Id.* ¶¶ 27, 35.  Plaintiff alleges that, in addition to violating their own policies, SOM and

MESA Defendants' failures effected a violation of the standard of care imposed by Maryland law.

40

These allegations go well beyond conclusory assertion.  Plaintiff identifies the source of the alleged duties SOM and MESA Defendants owed Plaintiff (the Covenant) and explains why and how harm to Plaintiff was foreseeable were their duties unfulfilled.  *See Addi*, 2020 WL 5076170, at *26, *supra*.  These factual allegations differ materially (in specificity and depth) from those presented in the Western District of Oklahoma case on which SOM and MESA Defendants rely, where "allegations providing a factual basis" to support the plaintiff's contention that the defendants were in a position to enforce policies were "[n]otably absent."  *Does 1-13 & 15-17 v. Mount Saint Mary High Sch. Corp. of the State of Oklahoma*, No. CIV-22-992-R, 2023 WL 5352924, at *2 (W.D. Okla. Aug. 21, 2023). (ECF No. 34-1 at p. 16.)  *See Mesmer*, 353 Md. at 254, *supra*.  Plaintiff has pled sufficient facts to allege that SOM and MESA Defendants owed Plaintiff a legally cognizable duty.

### 2. *Counts I and II: Negligent Hiring and Negligent Supervision, Retention, and Training*

"An employer is obligated 'to the public to use due care in selecting and retaining only competent and careful employees.'"  *State v. Jones*, 197 Md. App. 638, 669–70 (2011), *rev'd on other grounds,* 425 Md. 1 (2012) (citing *Henley v. Prince George's Cnty.,* 60 Md. App. 24, 36 (1984)).

> To state a claim for negligent hiring, training, or supervision, Plaintiff must show: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring, [training, or supervising the employee] . . . as the approximate cause of plaintiff's injuries."

*Karn v. PTS of Am., LLC*, 590 F. Supp. 3d 780, 805 (D. Md. 2022).  These same elements were also identified in the Appellate Court of Maryland's decision in *Mitchell v. Rite Aid of Maryland, Inc.* 257 Md. App. 273, 333, *cert. denied,* 483 Md. 579 (2023).  *See also Latty v. St. Joseph's Soc.*

*of Sacred Heart, Inc.*, 198 Md. App. 254, 272–73 (2011), *abrogated on other grounds by Plank v. Cherneski*, 469 Md. 548 (2020) (identifying the above elements that must be alleged "[t]o survive a motion to dismiss"); and *Francis v. Maryland*, No. CV ELH-21-1365, 2023 WL 2456553, at *35 (D. Md. Mar. 10, 2023) (stating the same elements).  "There is a rebuttable presumption that an employer uses due care in hiring an employee." *Doe v. Cmty. Coll. of Baltimore Cnty.*, 595 F. Supp. 3d 392, 419 (D. Md. 2022) (citations omitted).  *See Horridge v. St. Mary's Cnty. Dep't of Soc. Servs.*, 382 Md. 170, 181 (2004) (same).

The court notes that Plaintiff argues, with supporting case law, for a slightly different standard, specifically that "the tort of negligent selection, training, or retention, like any negligence action," requires allegations of the four elements of negligence: "(1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury; and (4) the injury proximately resulted from the defendant's breach." *Jones v. State*, 425 Md. 1, 18 (2012). *See* ECF No. 37 at p. 13; *Marrick Homes LLC v. Rutkowski*, 232 Md. App. 689, 709 (2017) ("[T]he elements of negligent supervision are identical to the elements of a general negligence claim."). Whether the standards are actually different or, as this court suspects, the standard articulated in *Karn* and *Mitchell* is simply a more descriptive recitation of the elements identified in *Jones* and *Marrick Homes*, in order to sustain claims for negligent hiring, supervision, and retention—claims that arise out of an employer's obligation to the public to select and retain "competent and careful employees"—a plaintiff must allege an employment relationship, as that is the basis for the duty itself.

SOM and MESA Defendants first argue that they cannot be liable for Jackson's hiring because MESA did not exist at the time of the hiring and "documentary evidence" demonstrates no relationship between SOM and MESA Defendants and Mercy High School at the time of

Jackson's hiring.   (ECF No. 34-1 at p. 17-18.)  As explained *supra*, the court will not consider SOM and MESA Defendants' "documentary evidence" on their Rule 12(b)(6) motion, however, SOM and MESA Defendants are correct that Plaintiff alleges that MESA was formed in 2017, two years after Jackson's hiring.  (ECF No. 33 ¶ 14.)

Plaintiff argues that her claim against MESA for Jackson's hiring may proceed under a theory of "successor liability."  (ECF No. 37 at p. 18.)  As SOM and MESA Defendants correctly point out, however, Plaintiff does not allege an operable or applicable predecessor-successor relationship with MESA that would render it liable for a predecessor's conduct; and Plaintiff acknowledges that she does not have information on any "transfer of authority."  (ECF No. 37 at p. 19.)  Contrary to Plaintiff's assertion that she is "entitled to discover that information," this is not the case where she has not alleged any factual allegation in support of MESA's successor liability.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  Plaintiff's claim for negligent hiring cannot proceed against MESA given its nonexistence at the time of Jackson's hiring and the complete absence of any factual framework on which to rest successor liability.  Count I will therefore be dismissed as against MESA.

SOM and MESA Defendants next argue that Plaintiff's Amended Complaint fails to allege facts to support the existence of an employment relationship between them and Jackson.  (ECF No. 34-1 at p. 20.)  Plaintiff appears to concede this point, arguing that the proper standard is one of general negligence and discovery should be permitted for her to ascertain whether an employment relationship exists.  (ECF No. 37 at p. 13–14.)  The court disagrees.  Whether there was an employment relationship between SOM and MESA, on the one hand, and Jackson, on the other, goes to the very essence of Plaintiff's claims for negligent hiring, supervision, retention, and training.  Pleading facts to show an employment relationship is vital to state a claim for relief that

is "plausible on its face." *Iqbal*, 556 U.S at 678.  The fact that something is "conceivable" is not enough.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Plaintiff fails to state claims for negligent hiring, supervision, retention, or training as against SOM and MESA (even if Plaintiff's negligent hiring claim against MESA were not to be dismissed for nonexistence at the time of the hiring); these claims will be dismissed as to those Defendants.[11]

### 3.  *Count VIII: Negligence*

All Defendants move to dismiss Plaintiff's general negligence claim for different reasons. SOM and MESA Defendants move to dismiss based on a lack of duty owed, as well as the same reasons applicable to the negligent hiring, supervision, and retention claims.  The court's analysis is the same here: while Plaintiff pleads sufficient facts to support a duty owed, she does not allege that a duty arose from SOM and MESA's employment relationship with Jackson.  The sole allegation that SOM and MESA Defendants breached their duty is that they "permit[ed] Jackson, a person ineligible for employment at a [SOM] sponsored school, to come into contact with Jane Doe and plac[ed] him in a position of trust and authority when they knew or should have known that a person who is ineligible for employment was likely to abuse and/or be inappropriate with children."  (ECF No. 33 ¶ 245.)  While general negligence of course does not require the presence of an employment relationship, because these Defendants' alleged breach of duty is based

---

[11] SOM and MESA Defendants further argue that Plaintiff fails to plead facts demonstrating their knowledge (actual or constructive) of Jackson's incompetence.  The court need not address this argument because dismissal is warranted based on the lack of allegations supporting a finding of an employment relationship; however, the court does not find SOM and MESA Defendants' arguments as to actual or constructive knowledge to be particularly compelling in light of the alleged duties under the Covenant, the students and staff who witnessed the relationship, the fact that abuse was happening in view of another employee's office, the fact that Defendants had notice of Jackson's inappropriate behavior, and the fact that Plaintiff alleges absolutely no pre-employment inquiry into Jackson in violation of Maryland law. *See Mitchell v. Rite Aid of Maryland, Inc.*, 257 Md. App. 273, 333, *cert. denied,* 483 Md. 579 (2023) (explaining that "employers are required to 'make some reasonable inquiry before hiring or retaining the employee to ascertain his fitness, or the employer must otherwise have some basis for believing that he can rely on the employee,' though the inquiry depended on the circumstances") (citing *Evans v. Morsell*, 284 Md. 160, 167 (1978)).

exclusively on the purported employment relationship between SOM and MESA and Jackson (and

Plaintiff offers no other basis to assert a breach of duty by these Defendants), Plaintiff fails to state

a claim for general negligence against SOM and MESA.

Mercy High School Defendants move to dismiss Plaintiff's general negligence claim for

separate reasons, arguing that the claim is "duplicative" of her negligent hiring, training, and

supervision claims.  Defendant relies upon *Doe v. Cmty. Coll. of Baltimore County*, in which the

court explained:

> Before reaching the merits of the Motion's arguments, I note that
> Counts I and II are duplicative because they "stem from identical
> allegations, that are decided under identical legal standards, and for
> which identical relief is available." *Wultz v. Islamic Republic of
> Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010) (citing *McGee v. District
> of Columbia*, 646 F. Supp. 2d 115, 121-22 (D.D.C. 2009)). And, a
> district court "has discretion to dismiss duplicative claims where
> they allege the same facts and the same injury." *C&K NuCo, LLC,
> Expedited Freightways, LLC*, 13 C 4006, 2014 WL 4913446, at *12
> (N.D. Ill. Sept. 30, 2014); *see W. Veg-Produce, Inc. v. The Lexy
> Group*, 2:18-cv-00180-ODW, 2018 WL 1804689, at *5 (C.D. Cal.
> Apr. 16, 2018) ("'A court may dismiss duplicative claims in its
> discretion.'") (quoting *DTCC Data Repository (U.S.) LLC v. U.S.
> Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 18 (D.D.C.
> 2014)); *Wultz*, 755 F. Supp. 2d at 81 ("As a matter of judicial
> economy, courts should dismiss a claim if it is duplicative of another
> claim in the same suit.").

595 F. Supp. 3d 392, 417 (D. Md. 2022).  Plaintiff counters that it is not her burden "to refute a

bald assertion of duplication" but does not mount an opposition supported by legal authority.  (ECF

No. 38 at p. 13.)

As Defendants acknowledge, whether to dismiss on grounds of duplication is discretionary;

the court declines to do so at this stage.  The factual allegations offered in support of Plaintiff's

negligence claim are similar to, and overlap with, the allegations in her negligent hiring,

supervision, retention, and training claims, but they are not true mirror images.  *See Doe*, 595 F.

Supp. 3d at 417 *supra*.  Plaintiff's claim for general negligence may proceed against Mercy High School and BOT.

### 4.  *Count III: Gross Negligence*

Mercy High School Defendants next move to dismiss Plaintiff's claim of gross negligence, asserting that Maryland does not acknowledge gross negligence as a separate cause of action. Specifically, Mercy High School Defendants contend that gross negligence "no longer has any independent legal viability, as it is either subsumed within a negligence case, or superseded by the actual malice standard for punitive damages."  (ECF No. 35 at p. 10)   Mercy High School Defendants take the position that gross negligence is relevant today only as an element of certain criminal charges, "municipal liability claims," or in matters related to partnership liability under Maryland law.  *Id.* at p. 10–11.  Alternatively, Mercy High School Defendants argue that Plaintiff does not competently state a claim for gross negligence under Maryland law.  *Id.* at p. 11.  Plaintiff disputes that gross negligence is not a separate cause of action and that she has ably stated a claim based on Mercy High School's adoption, and subsequent violation, of the Archdiocese's Policy. (ECF No. 38 at p. 8–11.)

In support of their argument that "gross negligence no longer has any independent legal viability," Mercy High School Defendants cite *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216 (1995).  There, the Court of Appeals of Maryland (now the Supreme Court of Maryland) discusses gross negligence in the context of punitive damages.  337 Md. at 228–29.  Mercy High School Defendants ignore case law (of this court) permitting claims of gross negligence to proceed as an independent cause of action outside of a municipal liability context.  *See, e.g.*, *Street v. Wylie Funeral Home, P.A.*, No. CV RDB-21-1970, 2022 WL 2315745, at *4 (D. Md. June 28, 2022); *Ezzat v. UGI/Ameriagas Corp.*, No. CV RDB-22-02918, 2023 WL 2864931, at *6 (D. Md. Apr. 10,

2023); *Shakeri v. MGM Nat'l Harbor, LLC*, No. GJH-21-551, 2022 WL 952026, at *1–2 (D. Md. Mar. 30, 2022); *Cowin v. Krebs*, No. CV JKB-17-3162, 2017 WL 6509005, at *2 (D. Md. Dec. 20, 2017); *Pasternak & Fidis, P.C. v. Recall Total Info. Mgmt., Inc.*, 95 F. Supp. 3d 886, 895 (D. Md. 2015). Though not dispositive, the argument further fails to consider that, even in the context of municipal liability and the Maryland Tort Claims Act, gross negligence often proceeds as a cause of action (as opposed to a mere element of a different claim). *See, e.g.*, *Doe v. Bd. of Educ. of Washington Cnty.*, No. CIV. JFM-15-00074, 2015 WL 4716065, at *4 (D. Md. Aug. 6, 2015); *Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 658–59 (D. Md. 2013), *aff'd*, 605 F. App'x 159 (4th Cir. 2015). The court agrees with Plaintiff that Mercy High School Defendants' argument lacks a sound legal basis. The court therefore declines at this stage to dismiss Plaintiff's claim of gross negligence on the basis that an independent claim in this factual context does not exist as a matter of law; Mercy High School Defendants are free to renew their argument on a Rule 56 motion.

Turning then to Mercy High School Defendants' argument that Plaintiff fails to state a claim based on her allegations, gross negligence "is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Anne Arundel Cnty. v. Reeves*, 474 Md. 46, 73 (2021). "[A] wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *Barbre v. Pope*, 402 Md. 157, 187 (2007) (citation omitted). While "a fine line exists between allegations of negligence and gross negligence," *see Stracke v. Estate of Butler*, 465 Md. 407, 420 (2019) (citation omitted), gross negligence is "something *more* than simple negligence, and likely more akin to reckless

conduct." *Reeves*, 474 Md. at 73 (emphasis in original) (quoting *Barbre*, 402 Md. at 187). "To state a claim for gross negligence, 'as with other negligence claims, [a plaintiff] must allege a duty of care, a breach of that duty, and damages as a proximate cause of the breach.'" *Pasternak & Fidis, P.C.*, 95 F. Supp. 3d at 895 (quoting *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.,* 190 F.Supp.2d 785, 803 (D. Md. 2002)). The plaintiff must also allege that "the defendant 'intentional[ly] fail[ed] to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another' or 'thoughtless[ly] disregard [ed] the consequences [of its breach of duty] without the exertion of any effort to avoid them.'" *Id.* (quoting *Brooks v. Jenkins,* 220 Md. App. 444, 459 (2014)).

Here, Mercy High School Defendants claim that Plaintiff's allegations do not rise to the level of employment decisions made "for the purpose of inflicting injury." (ECF No. 35 at p. 12.) Plaintiff, however, need not plead that Mercy High School Defendants "intentionally" made employment decisions with regard to Jackson for the purpose of inflicting injury. (ECF No. 35 at p. 12.) Gross negligence is not limited to a defendant's intentional infliction of injury; it may include a scenario in which a defendant acts in a manner "so utterly indifferent to the rights of others that he acts as if such rights did not exist." *Reeves*, 474 Md. at 73.

Plaintiff alleges that Mercy High School Defendants failed to complete a background check on an applicant who, if hired, would work with the very minor students charged to Mercy High School Defendants' protection and care (both by way of their own policy as well as Maryland law). Such allegations are sufficient on their face to support a conclusion that Mercy High School Defendants acted with reckless and/or thoughtless disregard of the consequences, and that they acted in a manner "utterly indifferent" to the rights of the school's minor students, including

Plaintiff.  *See Pasternak & Fidis, P.C.*, 95 F. Supp. 3d at 895, *supra*.[12]  Accordingly, Plaintiff states a claim of gross negligence.

### F.  Count IV: Breach of Fiduciary Duty

Defendants separately move to dismiss Plaintiff's breach of fiduciary duty claim – Mercy High School Defendants argue that no fiduciary relationship exists between a school and a student; SOM and MESA Defendants argue that no fiduciary relationship exists between a school sponsor and a student.  (ECF No. 34-1 at p. 27–29; ECF No. 35 at p. 18–20.)  Plaintiff counters that a school has a special duty to exercise reasonable care to protect students from harm.  (ECF No. 37 at p. 15–16; ECF No. 38 at p. 11–12.)

"[A] fiduciary duty is, in general, a duty to act for the benefit of another on matters within the scope of the parties' relationship."  *Plank v. Cherneski*, 469 Md. 548, 601 (2020) (citing Restatement (Third) of Torts: Liab. For Econ. Harm § 16 cmt. a (Am. Law Inst. 2020)).  "To establish a breach of fiduciary duty as an independent cause of action, a plaintiff must show: '(i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary.'"  *Plank*, 469 Md. at 599 (citing *Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000)).  "[F]iduciary relationships can be created by common law, by statute, or by contract, and can have different characteristics."  *Id.* at 598.  *See Gandy v. Howard Cnty. Bd. of Educ.*, No. CV GLR-20-3436, 2021 WL 3911892, at *5 n.4 (D. Md. Sept. 1, 2021) (same) (quoting *Froelich*, 96 F. Supp. 2d at 526).  A court considers the "nature of the fiduciary relationship" on a case-by-case basis.  *Plank*, 469 Md. at 599.  "Well-known examples

---

[12]   Although not dispositive, the court agrees with Plaintiff that her gross negligence claim is further bolstered by allegation that President Lennon intentionally misrepresented to parents that "'Mercy High School's hiring process complies with all applicable laws and that all candidates for employment 'undergo a fingerprint criminal background check through the FBI's Criminal Justice Identification Services (CJIS) Division' that is updated automatically to apprise the school if employees are subsequently charged with crimes."  (ECF No. 33 ¶ 115.)

of habitual or categorical fiduciary relationships include those between trustees and beneficiaries, agents and principals, directors and corporations, lawyers and clients, and guardians and wards, as well the relationship among partners." *Id.* at 598 (citations omitted).

"[A] fiduciary relationship will have 'general responsibilities that are common to all settings[,]'" and "specific obligations that vary from one circumstance to the next." *Id.* at 601. "Normally, the determination of whether a fiduciary relationship exists between two individuals is a question of fact." *McElwee v. Williams*, No. 1194, Sept. term, 2019, 2020 WL 6748799, at *3 (Md. Ct. Spec. App. Nov. 17, 2020) (citing *Brass Metal Products, Inc. v. E-J Enters., Inc.*, 189 Md. App. 310, 355 (2009)). "Once a fiduciary relationship is established, there is 'a duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation.'" *Id.* (citing *Lasater v. Guttman*, 194 Md. App. 431, 456 (2010)). As explained *supra*, stemming from the *in loco parentis* doctrine, "a school is under a special duty to exercise reasonable care to protect a pupil from harm." *Eisel v. Bd. of Educ. of Montgomery Cnty.*, 324 Md. 376, 384 (1991) (quoting *Lunsford v. Board of Educ.,* 280 Md. 665, 676 (1977) (footnote omitted)); *see also Gambrill v. Bd. of Educ. of Dorchester Cnty.*, 481 Md. 274, 314 (2022) ("[I]t is undisputed that a school has a duty "to exercise reasonable care to protect a pupil from harm."); *Loveless v. Estevez*, No. 01985, Sept.term,2017, 2019 WL 4187465, at *6 (Md. Ct. Spec. App. Sept. 3, 2019) ("The Court of Appeals has recognized that a school has such a duty: specifically, 'a special duty to exercise reasonable care to protect a pupil from harm.'"); *Collins v. Bd. of Ed. of Kent Cnty.*, 48 Md. App. 213, 218 (1981) (noting "the common law duty that school authorities have, as the temporary custodians of children, to exercise reasonable care for their protection").

*In re Gloris H*., an opinion of the Supreme Court of Maryland, is helpful and succinct on the subject:

> The law imposes a duty on children to attend school and on parents
> to relinquish their supervisory role over their children to teachers
> and administrators during school hours. While their children are
> educated during the day, parents transfer to school officials the
> power to act as the guardians of those young wards. No greater
> obligation is placed on school officials than to protect the children
> in their charge from foreseeable dangers, whether those dangers
> arise from the careless acts or intentional transgressions of others.

410 Md. 562, 583 (2009) (quoting *Frugis v. Bracigliano,* 827 A.2d 1040, 1050 (N.J. 2003)).

Relevant here, where a plaintiff successfully states a negligence claim, this court has repeatedly

held that the plaintiff's breach of fiduciary duty claim may proceed at the 12(b)(6) stage. *Heward*

*v. Bd. of Educ. of Anne Arundel Cnty.*, No. 1:23-CV-00195-ELH, 2023 WL 6381498, at *61 (D.

Md. Sept. 29, 2023); *Doe #1 v. Bd. of Educ. of Somerset Cnty.*, No. CV RDB-22-1491, 2023 WL

375189, at *6 (D. Md. Jan. 24, 2023); *Gandy v. Howard Cnty. Bd. of Educ.*, No. CV GLR-20-

3436, 2021 WL 3911892, at *5 n.4 (D. Md. Sept. 1, 2021).

### 1.  *Mercy High School Defendants*

Mercy High School Defendants argue that, because Plaintiff is a member of a student

population, they only owe her "general responsibilities that are common to all." (ECF No. 35 at

p. 18.) This is not compelling and, in the court's opinion, misreads *Plank*: fiduciary relationships

often arise where a party owes a special duty to multiple "clients" at the same time, such as with

trustees, agents, and lawyers. *Plank*, 469 Md. at 598, *supra*. And while Mercy High School

Defendants' reliance upon *Brummell v. Talbot Cnty. Bd. of Educ.*, No. CV RDB-22-1601, 2023

WL 2537438, at *8 (D. Md. Mar. 16, 2023), is well-taken, it is unpersuasive. Multiple opinions

of this court have permitted a breach of fiduciary duty claim to proceed where the plaintiff has

sufficiently pled a claim for negligence. *See, e.g., Heward*, 2023 WL 6381498, at *61, *supra*; *Doe*

*#1*, 2023 WL 375189, at *6, *supra*; *Gandy*, 2021 WL 3911892, at *5 n.4, *supra*. Moreover, Mercy

High School Defendants' reliance on *Brummell* is not compelling in view of Maryland

jurisprudence acknowledging the "special duty" owed by a school to its student.  *See Eisel*, 324 Md. at 384, *supra*; *Gambrill*, 481 Md. at 314, *supra*; *Loveless*, 2019 WL 4187465, at *6, *supra*; *Collins*, 48 Md. App. at 218, *supra*.

The court is persuaded that a fiduciary duty exists between a school and its student in view of a school's "special duty" to protect a student from harm.  Moreover, there is a great deal of "trust and confidence" that a student must repose in her school by nature of the relationship.  *Accord McElwee*, 2020 WL 6748799, at *4 (quoting *Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 70 (2015) (discussing when a confidential relationship is created and equating fiduciary relationships with confidential relationships).[13]  Plaintiff's breach of fiduciary duty against Mercy High School and BOT may proceed.

### 2.  *SOM and MESA Defendants*

The court disagrees with SOM and MESA Defendants that no fiduciary duty exists between a school sponsor and a student where Plaintiff has alleged that the Covenant created a fiduciary relationship between SOM and MESA Defendants and the students of Mercy High School.  (ECF No. 34-1 at p. 28; ECF No. 33 ¶ 23.)  *See Plank*, 469 Md. at 599, *supra* (noting a fiduciary relationship can be created by contract).  That notwithstanding, Plaintiff rests her breach of fiduciary duty claim against SOM and MESA Defendants squarely on the same allegations offered in support of her negligence claims,[14] which the court has determined may not proceed.  Because the court has concluded that Plaintiff fails to state a claim against SOM and MESA on the basis of negligence, *see supra* Section IV.E.3, those allegations similarly fail to state a claim against SOM

---

[13] The court is also persuaded to permit Plaintiff's breach of fiduciary duty claim to proceed based on its satisfaction that her negligence claim is well-stated.  *See Heward*, 2023 WL 6381498, at *61, *supra*; *Doe #1*, 2023 WL 375189, at *6, *supra*; *Gandy*, 2021 WL 3911892, at *5 n.4, *supra*.

[14] Plaintiff's Amended Complaint alleges that "Defendants breached their fiduciary duty to Plaintiff as set forth herein, particularly in the ways described in Counts I, II, and VIII for negligence."  (ECF No. 33 ¶ 194.)

and MESA for breach of fiduciary duty.  *See Heward*, 2023 WL 6381498, at *61, *supra*; *Doe #1*, 2023 WL 375189, at *6, *supra*; *Gandy*, 2021 WL 3911892, at *5 n.4, *supra*.  The court will dismiss Plaintiff's claim for breach of fiduciary duty against SOM and MESA.

### G. Punitive Damages

Finally, Mercy High School Defendants seek dismissal of Plaintiff's request for punitive damages.  (ECF No. 35 at p. 15.)  Judge Bredar's opinion in *Aarow Electrical Solutions v. Tricore Systems, LLC*, is instructive and persuasive:

> Practices in this District regarding dismissal of punitive damages claims on a Rule 12(b)(6) motion vary. *Compare Harris v. Dow Chem. Co.*, Civ. No. DKC-20-0988, 2020 WL 6874326, at *3 (D. Md. Nov. 23, 2020) (dismissing a request for punitive damages pursuant to Rule 12(b)(6)) *with Charette v. Wexford Health Sources, Inc.*, Civ. No. CCB-19-0033, 2021 WL 1102361, at *12 (D. Md. Mar. 23, 2021) (explaining that "[s]ome courts have concluded that a Rule 12(b)(6) motion is not the appropriate vehicle to challenge a request for punitive damages" and concluding that "any decision about whether [the plaintiff] may be entitled to punitive damages will be deferred, and the court will deny the defendants' motion as it pertains to the issue of punitive damages"). The Court finds that the latter course better comports with the purpose of Rule 12(b)(6) motion, which is a means by which to assert that a party has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. Pr. 12(b)(6). Here, Defendants' argument is better understood as a challenge to the relief Aarow seeks, rather than as a challenge to Aarow's claims.
>
> Although the Court will not strike or dismiss the punitive damages claims at this juncture, the Court seriously doubts that punitive damages are appropriate in this case, given Maryland's high bar for the imposition of punitive damages and the facts alleged. *See Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1123 (Md. 1995) ("[P]unitive damages may only be awarded in such cases when the plaintiff has established that the defendant's conduct has characterized by evil motive, intent to injure, ill will, or fraud, i.e., 'actual malice.'" (citation and quotations omitted)); *Beall v. Holloway-Johnson*, 130 A.3d 406, 419 (Md. 2016) ("Punitive damages are reserved typically for punishing the most heinous of intentional torts and tortfeasors.").

> For the forgoing reasons, the Court will deny Original Defendants'
> Motions to Dismiss to the extent that they seek dismissal of the
> punitive damages requests. Defendants may of course raise this
> issue again at the appropriate time.

No. CV JKB-22-2363, 2024 WL 1443743, at *4–5 (D. Md. Apr. 3, 2024).

The court finds Judge Bredar's reasoning applicable here: while Mercy High School Defendants' arguments bring scrutiny, if not doubt, upon Plaintiff's ability to recover punitive damages under Maryland law, these arguments focus on the relief sought, not the claims asserted. At this stage, the court will deny Mercy High School Defendants' Motion to Dismiss to the extent it seeks disallowance of Plaintiff's request for punitive damages.

## V.     CONCLUSION

For the reasons set forth herein, by separate order, the SOM and MESA Defendants' Motion (ECF No. 34) will be granted, and the Mercy High School Defendants' Motion (ECF No. 35) will be granted in part and denied in part.  To summarize, Plaintiff's claims will proceed as follows and otherwise be dismissed without prejudice:

| Counts | Defendants |
|---|---|
| Count I: Negligent Hiring | Mercy High School, BOT |
| Count II: Negligent Supervision, Retention & Training | Mercy High School, BOT |
| Count III: Gross Negligence | Mercy High School, BOT |
| Count IV: Breach of Fiduciary Duty | Mercy High School, BOT |
| Count V: Violation of 20 U.S.C. § 1681 *et seq.* | Mercy High School, BOT |
| Count VI: Retaliation in Violation of 20 U.S.C. § 1681 *et seq.* | Mercy High School |
| Count VII: Fraudulent Conveyance | Mercy High School, BOT, MHSAM (as to the 2022 Tower Lease Transaction) |
| Count VIII: Negligence | Mercy High School, BOT |

June 24, 2024

/s/ _____
Julie R. Rubin
United States District Judge